WATERGATE IMPROVEMENT ASSOCIATES (a limited partnership), Petitioner,

v.

PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,

Washington Gas Light Company, Intervenor.

No. 7549.

District of Columbia Court of Appeals.

Argued Dec. 13, 1973.

Decided Sept. 23, 1974.

A. Fred Freedman, Washington, D.C., for petitioner.

Linus H. Deeny, Asst. Corp. Counsel, with whom C. Francis Murphy, Corp. Counsel, and C. Belden White, II, Asst. Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Paul H. Harrington, Washington, D.C., with whom Samuel S. Hollingsworth, Henry F. Krautwurst and Paul H. Ford, Washington, D.C., were on the brief, for intervenor. Kevin J. Baldwin, Washington, D.C., entered an appearance for intervenor.

Before KELLY, NEBEKER and PAIR, Associate Judges.

KELLY, Associate Judge:

■ On March 28, 1973 respondent Public Service Commission of the District of Columbia issued an order approving new rate schedules and regulations proposed by intervenor Washington Gas Light Company to govern steam and chilled water service to the Watergate complex,[1] to become effective April 1, 1973.[2] Petitioner Watergate Improvement Associates (Watergate)[3] asked the Commission to reconsider its order[4] and when the request was denied[5] sought appellate review pursuant to D.C.Code 1973, § 43–705.

The issues raised on appeal are (1) whether the Public Service Commission (Commission) has jurisdiction over the rates charged by Washington Gas Light Company for steam and chilled water service to the Watergate complex; (2) whether Watergate received adequate notice of the proposed increases in its steam and chilled water service rates; (3) whether the Commission was bound by the terms and conditions of the original contract between Watergate's predecessor in interest and Washington Gas Light Company, and (4) whether the approved rates are just and reasonable and based on an adequate analysis of the evidence in the record. For the reasons which follow we affirm.

I

The service at issue is the supplying and transmission by Washington Gas Light Company (WGL) of steam and chilled water through a series of pipes in the Watergate buildings for the purpose of heating and cooling the buildings. The contract between WGL and Watergate, the only customer for this unique service, was agreed to in 1964. WGL, in turn, sought authorization from the Commission to pro-

---

1. The Watergate complex consists of a group of six buildings—a hotel, two office buildings, and three cooperative apartment buildings (Watergate South, West and East).

2. Formal Case No. 567, Order No. 5571, Mar. 28, 1973. The effectiveness of the Commission's order has not been stayed by this appeal. See D.C.Code 1973, § 43–707.

3. Watergate Improvement Associates, representing the hotel and two office buildings, is the only party which has filed a petition of appeal.

4. A request for reconsideration is a jurisdictional prerequisite to filing a petition of appeal. D.C.Code 1973, § 43–704. See also Goodman v. Public Service Commission, D.C. App., 309 A.2d 97, 100 n. 2 (1973); Washington, Marlboro & A. M. Lines v. Public Util. Com'n, 114 F.Supp. 321, 326 (D.D.C.1950), aff'd 93 U.S.App.D.C. 63, 206 F.2d 490 (1953).

5. Formal Case No. 567, Order No. 5581, May 29, 1973.

vide the service. The Commission granted WGL the permission it sought, determining that the service came within its jurisdiction, and approved the initial contract rates as just and reasonable.[6] Its order was subsequently upheld by the United States District Court for the District of Columbia, Asso. Fair Competitive Practices v. D. C. Pub. Serv. Comm., 65 P.U.R.3d 303 (D.C.1965), aff'd, Association of Fair Comp. Prac. in Air Con. v. Public Serv. Com'n, 125 U.S.App.D.C. 361, 372 F.2d 934 (1967).

On July 9, 1971, in a case captioned "In the Matter of the Application of WASHINGTON GAS LIGHT COMPANY for authority to increase existing rates, tolls, charges and schedules for gas service", WGL applied for a general increase in its retail rates sufficient to produce at least an 8.50% rate of return on its rate base.[7] A public notice summarizing the application and inviting interested parties to respond regarding the application prior to September 16, 1971 was issued on August 17, 1971: It was captioned "IN THE MATTER OF Application of WASHINGTON GAS LIGHT COMPANY for an increase in its rate of return and for an increase in the existing rates, tolls, and charges for gas service." During the months that followed the Commission first disposed of preliminary matters and then, on January 10, 1972, issued an order delineating the matters at issue, setting the schedule of future proceedings, granting intervention to seven parties, and dividing

the case in two segments: Phase I to determine operating results, revenue requirements and rate of return; Phase II to determine the appropriate rate structure.[8] Additional motions for intervention were granted and additional procedural motions were received and granted during Phase I of the proceedings. When Phase I was completed the Commission issued its order of August 2, 1972,[9] in which it found, among other things, that a fair and reasonable rate of return for WGL was 8.23% and to realize that rate of return required a $1,611,000 increase in WGL's District of Columbia operating revenues. WGL was directed to submit proposed rate schedules, with supporting testimony, to initiate Phase II of the proceedings.

Proposed rate schedules and supporting testimony, including a new schedule for the steam and chilled water service to the Watergate complex, were submitted on August 11, 1972. It was at the point when Phase II hearings commenced; viz., September 1, 1972, that counsel for the various Watergate complex interests [10] sought to intervene, complaining that they had first learned of the dimensions of the proposed increases in Watergate's rates through a letter sent them by WGL on August 25, 1972.[11] A 60-day continuance was also requested. Intervention was granted but the Commission denied the requested continuance and required Watergate counsel to proceed with cross-examination, adding that the parties would be permitted to file briefs on the issues raised by Watergate.

6. Re Washington Gas Light Co., Formal Case No. 503, Order No. 4902, Mar. 18, 1965; 58 P.U.R.3d 1 (D.C.1965).

7. The last rate of return the Commission had authorized was 6.45% in 1958.

8. Formal Case No. 567, Order No. 5494, Jan. 10, 1972.

9. Formal Case No. 567, Order No. 5522, Aug. 2, 1972.

10. Counsel for Watergate East and Watergate West each entered an appearance. The two office buildings and the hotel were represented by counsel for their owner Water-

gate Improvement Associates. Watergate South was not represented itself but counsel for Watergate Improvement Associates stated that he represented it also. A letter affirming this was subsequently filed with the Commission.

11. WGL's counsel explained at the September 1st hearing that letters calling attention to the proceedings in progress before the Commission and the results of Phase I were sent to the Watergate complex on August 25th because WGL was surprised that, with Watergate's interests being affected, it had not sought to intervene in the proceedings.

On consideration of the briefs which were later filed and of a proposed stipulation between Watergate and WGL conceding that Watergate had not been given adequate and proper notice of the proposed rate increases, the Commission issued an order rejecting the stipulation but reopening the record with respect to the steam and chilled water rates.[12] The order provided in part that

> . . . in the interest of fairness to all parties and persons affected, Watergate shall be given an opportunity to cross-examine the Company on that portion of its testimony in the record relating to steam and chilled water rates and to submit testimony and exhibits solely relating to the issue of the proposed steam and chilled water rates . . . Watergate's testimony shall be subject to cross-examination by the Company, any other intervenors, and the Staff of the Commission. . . .[13]

To avoid further delay WGL requested that the Phase II proceedings, excepting those relating to Watergate, continue without interruption on condition that if the proposed Watergate increase were reduced WGL would not seek to recover the lost revenue through additional changes in its gas rates. Accepting WGL's proposal the Commission issued its Phase II order of October 26, 1972, in which it approved WGL's proposed gas rate schedules and regulations, with specified modifications, to be effective November 1, 1972.[14]

Proceedings respecting the proposed steam and chilled water rates were subsequently completed. After receipt of additional briefs, hearings and oral argument, the Commission issued its opinion and order approving the rate schedules and regulations proposed by WGL for the steam and chilled water service, finding them to

be just, reasonable and nondiscriminatory.[15] It is from this order, which the Commission declined to reconsider[16] (as well as the prior underlying orders), that Watergate appeals.

II

It is necessary to note at the outset that the scope of our review of the Commission's actions is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are *unreasonable, arbitrary, or capricious.*" D.C.Code 1973, § 43–706. *See, e. g.,* Goodman v. Public Service Commission, D.C. App., 309 A.2d 97, 100 (1973); Telephone Users Ass'n v. Public Service Com'n of D.C., D.C.App., 304 A.2d 293, 296 (1973), cert. denied, 415 U.S. 933, 934, 94 S.Ct. 1448, 1449, 39 L.Ed.2d 492 (1974); Goodman v. Public Service Com'n of District of Columbia, D.C.Cir., 497 F.2d 661 (1974); D. C. Transit System, Inc. v. Public Utilities Com'n of D. of C., 110 U.S.App.D.C. 241, 292 F.2d 734 (1961); Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 118–119, 188 F.2d 11, 14–15 (1950), cert. denied, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951).

The applicable principles on review are those expressed in Western Air Lines, Inc. v. Civil Aeronautics Board, 495 F.2d 145, 152 (D.C.Cir. 1974), as follows:

> In reviewing the Board's action, we are bound by the Board's findings of fact if supported by substantial evidence. . . . If the findings are supported by substantial evidence, we must accept also the conclusions drawn therefrom unless they are seen to be arbitrary or capricious, or to rest on premises that are

---

12. Formal Case No. 567, Order No. 5536, Oct. 6, 1972.

13. *Id.* at 2.

14. Formal Case No. 567, Order No. 5542, Oct. 26, 1972.

15. Formal Case No. 567, Order No. 5571, Mar. 28, 1973.

16. Formal Case No. 567, Order No. 5581, May 29, 1973.

deemed contrary to ascertainable legislative intent, or are otherwise contrary to law. . . . In applying the substantial evidence test, "we are obliged to search the entire record, or those parts of it to which the parties refer us, to determine whether . . . the agency . . . could fairly and reasonably find the facts as it did." . . . A conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view. . . .[17] [Citations omitted.]

And the methodology of such review is that explained in Goodman v. Public Service Com'n of District of Columbia, *supra* 497 F.2d at 666:

In any analysis of whether an end result (i. e. the new rate) is not arbitrary, we are aware that since the result is but the "sum of a number of components," each component must be analyzed. Mississippi River Fuel Corp. v. FPC, 82 U.S. App.D.C. 208, 163 F.2d 433, 451 (1947). As is pointed out in the *Mississippi River* case, a component analysis was in fact used by Mr. Justice Douglas in the case of FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) from which the "end result" language is often drawn. *Id.* at 603, 64 S. Ct. 281. We must ascertain, as appellee Pepco agrees, "whether each of the Commission's Order's essential elements is supported by substantial evidence in the record." If each component or element is not arbitrary or capricious, the end result will be a sound one. [Footnote omitted.]

■ As a final guideline to judicial review it must be remembered that the onus is on the petitioner to make "a convincing showing that [the rate order] is invalid because it is unjust and unreasonable in its

consequences." Federal Power Com. v. Hope Nat. Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *accord*, Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Goodman v. Public Service Commission, *supra* 309 A.2d at 101. *See also* D.C.Code 1973, § 43–703.

### III

■ Watergate first challenges the Commission's assertion of jurisdiction over rates charged by WGL for the steam and chilled water service, arguing that those rates must be governed by the original contract entered into by the parties in 1964. The contention is that the steam and chilled water service is not a public utility function within the meaning of relevant statutes (D.C.Code 1973, §§ 43–103, 43–121); thus the Commission's jurisdiction over the arrangement is limited to a determination of whether or not WGL should initially be permitted to enter into the service. *See* Classified Directory Subscribers Ass'n v. Public Serv. Com'n, 127 U.S.App. D.C. 315, 383 F.2d 510 (1967). In this context Watergate raises the alarming spectre that, assuming jurisdiction, every fuel oil company delivering oil through pipes and every real estate owner in the District who leases office space or apartments and offers its tenants heat and/or air conditioning by means of a boiler or refrigeration unit which employs pipes or tubing would likewise be subject to the Commission's regulation.

The jurisdictional question presented is not new, for it was raised when WGL originally sought permission to enter this service area. In granting WGL's original application the Commission specifically found that "[t]he proposed service to the Watergate project is within the regulatory jurisdiction of this commission" and that

---

17. For an excellent discussion of the court's function in reviewing agency decisions, see Judge Leventhal's opinion in Greater Boston Television Corporation v. F.C.C., 143 U.S.

App.D.C. 383, 392–395, 444 F.2d 841, 850–853 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

"[t]he rates for the proposed service are just and reasonable." Re Washington Gas Light Co., *supra* note 6, 58 P.U.R.3d at 23 (D.C.1965). This order was affirmed by the United States District Court for the District of Columbia and that court's judgment, in turn, was sustained on appeal.[18] Neither opinion specifically addresses the question of the Commission's jurisdiction, however, and it is unclear whether or not the issue was considered on appeal. In the interest of dispelling uncertainty we review and affirm the Commission's jurisdiction, finding its decision on this issue to be sound.

The Commission's jurisdictional determination was made by looking to four sections of the Public Utilities Act (D.C.Code 1973, Title 43). It found:

> Subject to our jurisdiction are those businesses included within the term "public utility." The Public Utilities Act states that the term "shall mean and embrace every . . . gas plant, gas corporation, . . . and pipeline company." D.C.Code, § 43–103 (1961). A "gas plant . . . includes all buildings, easements, real estate, mains, pipes, conduits, service pipes, services, pipe galleries, meters, boilers, water-gas sets, retorts, fixtures, condensers, scrubbers, purifiers, holders, materials, apparatus, personal property, and franchises, and property of every kind used in the conduct of the business operated, owned, controlled, used or to be used for or in connection with or to facilitate the manufacture, distribution, sale, or furnishing of gas (natural or manufactured) for light, heat, or power." Id., § 43–112. In defining a "pipeline company" the act states that the term "includes every corporation . . . owning, operating, managing, or controlling the supply of

any liquid, steam, or air through pipes or tubing to consumers for use or for lighting, heating, or cooling purposes, or for power." Id., § 43–121. In another section, the commission is told to interpret and construe the act "liberally in order to accomplish the purposes thereof. . . ." Id., § 43–1003. . . .[19]

[Re Washington Gas Light Co., *supra* note 6, 58 P.U.R.3d at 9.]

The Commission concluded that "[w]hen we read these provisions together, it becomes evident that the sale of steam and chilled water under the proposal is within the ambit of our regulatory authority." *Id.*

Although the ultimate responsibility for determining the correct interpretation of a statute rests with the courts,[20] "[i]t is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute." Investment Co. Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 1097, 28 L.Ed. 2d 367 (1971). Indeed, "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. . . ." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); *accord*, New York Dept. of Social Services v. Dublino, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); Columbia Broadcasting v. Democratic Comm., 412 U.S. 94, 121, 93 S. Ct. 2080, 36 L.Ed.2d 772 (1973). "To sustain the Commission's [construction] . . . we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. . . ." Unemployment Comm'n v. Aragon, 329 U.

---

18. Association of Fair Comp. Prac. in Air Con. v. Public Serv. Com'n, *supra.*

19. The Commission's opinion cites the 1961 edition of the Code, but the pertinent provisions remain the same today.

20. FTC v. Texaco, 393 U.S. 223, 226, 89 S. Ct. 429, 21 L.Ed.2d 394 (1968).

S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946), quoted with approval in Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) and Philadelphia Television Broadcasting Co. v. F.C.C., 123 U.S.App.D.C. 298, 299–300, 359 F.2d 282, 283–284 (1966); *see also* Classified Directory Subscribers Ass'n v. Public Serv. Com'n, *supra*, 127 U.S.App.D.C. at 318–319, 383 F.2d 510.

We agree that coverage under the Public Utilities Act is sufficiently broad to encompass the service here in question. The consumers, tenants of Watergate, receive their heating and cooling from a third party (WGL) who is neither their landlord nor their cooperative management group. WGL not only distributes but also manufactures the steam and chilled water sold to supply the heating and cooling needs of this consumer group. Moreover, WGL, itself a public utility subject to regulation, was joined by Watergate in actively seeking the Commission's regulation in this service area in the first place. Accordingly, we affirm the Commission's finding of jurisdiction.[21]

IV

Petitioner complains that the lack of reasonable and proper notice of the proposed increases in steam and chilled water rates was a denial of procedural due process. The Commission's response is that any technical deficiencies in the original notice were cured by the subsequent reopening of the case, thus affording Watergate "ample opportunity over a period of 4½ months, to present its evidence and to brief and argue its case fully." Formal Case No. 567, Order No. 5581 at 2, May 29, 1973.

■ Review of the sufficiency of notice in administrative proceedings is not limited to a determination of compliance, vel non, with statutory notice provisions. "[T]he question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure. . . ." 1 K. Davis, Administrative Law Treatise § 8.04 at 525 (1958), quoted with approval in Kartsonis v. District Unemployment Comp. Bd., D.C.App., 289 A.2d 370, 371, cert. denied, 409 U.S. 872, 93 S.Ct. 203, 34 L.Ed.2d 124 (1972). The requirements of procedural due process are met if upon review the court is satisfied that a complainant was given adequate opportunity to prepare and present its position to the Commission and that no prejudice resulted from the originally deficient notice. Montana Power Co. v. Federal Power Commission, 87 U.S.App.D.C. 316, 322, 185 F.2d 491, 497 (1950), cert. denied, 340 U.S. 947, 71 S.Ct. 532, 95 L.Ed. 683 (1951); Kuhn v. Civil Aeronautics Board, 87 U.S.App.D.C. 130, 183 F.2d 839 (1950).[22]

■ Petitioner correctly points out that WGL's initial application and public notice were captioned as requests for increases in *gas* rates and thus did not clearly indicate that changes in steam and chilled water rates were also being sought. It is important to note, however, that the steam and chilled water rates are partially dependent on the interruptible gas rate charged other WGL customers and to that extent Watergate was on notice that its rates might be changed. What Watergate was not apprised of by the original notice was that changes in other *expense* factors affecting the steam and chilled water rates were also being sought. Despite this original defect, we nevertheless find that no prejudice re-

21. Insofar as Watergate's contention that affirmation of jurisdiction here would mean fuel oil companies and real estate owners who lease space would likewise be subject to regulation, we do not decide the validity of that assertion because those issues are not before this court. All we decide today is that the Commission properly determined that it had jurisdiction over the rates charged by WGL for steam and chilled water service to the Watergate complex.

22. Frank E. Cooper, author of the treatise State Administrative Law, concurs in this analysis characterizing imperfections in the original notice as harmless error, presuming they are cured by subsequent actions. 1 F. Cooper, State Administrative Law 273–286 (1965).

sulted as any possible prejudice was adequately cured by the Commission's subsequent actions in allowing Watergate to be heard.

Once Watergate sought to intervene, the Commission immediately granted the request and reopened the proceedings respecting the rates for the Watergate service. Formal Case No. 567, Order No. 5536, Oct. 6, 1972. Notwithstanding Watergate's assertion to the contrary, the record is clear that the new steam and chilled water rates were approved by the Commission only after careful study and evaluation of the evidence produced at the reopened proceedings and were not preordained by the total increase in revenue requirement to which the Commission had previously determined WGL was entitled.[23] The Commission specifically stated in its order granting increases in gas rates that the question of how much revenue WGL was entitled to receive from the Watergate service was yet to be decided. Formal Case No. 567, Order No. 5542, Oct. 26, 1972. WGL's undertaking that should its proposed increases be reduced it would not seek to make up the lost revenue through additional changes in gas rates further buttresses this conclusion. Moreover, in addition to being permitted to cross-examine WGL's case, Watergate was given ample time to prepare and to present its own case, complete with expert testimony in support and in explanation thereof. Both WGL's and Watergate's cases were subject to cross-examination and evaluation by the Commission's own experts. Finally, both were permitted to argue their cases on brief. We must conclude, therefore, that the challenged proceedings before the Commission met the requirements of proce-

dural due process because any defect in the original notice was cured by subsequent rulings of the Commission which precluded any resultant prejudice to Watergate.

## V

Petitioner would next have us hold that, assuming jurisdiction, the Commission's rate-making power in the unique service area involved is limited by Watergate's original service agreement with WGL. Relying on F.P.C. v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) and United Gas Co. v. Mobile Gas Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), Watergate asserts that the terms of the original service agreement must be relied upon before determining that higher rates than would be provided for in those terms are essential to protect the public interest. Petitioner argues that the contract agreed to by the parties adequately protected their interests and was thus fair and reasonable, adding that Watergate would not have arranged for WGL to provide the service without the latter's consent to the terms and conditions of the agreement.

The Commission dealt with this issue both in its order granting interim rate increases [24] and its order granting the final increases.[25] In Order No. 5571 it stated, in pertinent part:

[N]othing in any private contract can in any way condition or diminish, let alone abrogate, our statutory powers over rates for this public utility service. Order No. 5546, p. 3. In any event, we do not regard the WGL–Watergate service agreement as attempting to do so. To the contrary, Sections 6(c) and 6(d)[26] of the

---

23. *See* Phase I order, wherein the Commission determined WGL was entitled to a $1,611,000 increase in operating revenues. Formal Case No. 567, Order No. 5522, Aug. 2, 1972.

24. Formal Case No. 567, Order No. 5546, Nov. 9, 1972.

25. Formal Case No. 567, Order No. 5571, Mar. 28, 1973.

26. Sec. 6. *Adjustment of Rates.* In addition to the escalator adjustments for changes in costs of fuel, labor, and taxes provided for in Exhibit C, the rates set forth in such exhibit also shall be subject to the following adjustments:

\* \* \* \* \*

(c) The furnishing of the Services provided for in this Agreement shall be subject to regu-

agreement plainly and specifically recognize and accept our jurisdiction. Under Section 6(d), either party has the right at any time to request this Commission to determine and fix just and reasonable rates for steam and chilled water service; under Section 6(c), they agree to be bound by Commission-set rates.

\*    \*    \*    \*    \*    \*

Moreover, in light of Sections 6(c) and 6(d) of the service agreement, we do not think that Watergate has obtained for itself contractual rights which can be abrogated only after the special showing discussed by the Court in *Sierra*. There, the customer had a fixed price set in a contract which made no provision for regulatory changes in that price. The Court held that the price could not be changed by a regulatory body simply because it did not produce the overall rate of return authorized for the utility. Rather, special circumstances, such as a threat to the Company's financial integrity, had to be shown. We do not read the Watergate contract as a fixed price contract, however. Here, the parties specifically recognized the Commission's power to change the contract rate and each party was free to seek such a change. In these circumstances, Watergate has contractually agreed to be treated as a utility customer paying the going rate and the Commission can look to the Watergate service to bear its proportionate share of the Company's revenue re-

quirement. See United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division, 358 U.S. 103 [79 S.Ct. 194, 3 L.Ed.2d 153] (1958). [Formal Case No. 567, Order No. 5571, at 3–4, Mar. 28, 1973.]

■ The Commission's analysis is correct insofar as it interprets the Agreement for Services (Contract) to recognize its power to change the steam and chilled water rate and to grant each party the right to seek rate changes. It is incorrect in saying that "nothing in any private contract can in any way condition or diminish, let alone abrogate, our statutory powers over rates for this public utility service." Such an assertion is overbroad and inconsistent with the Commission's ruling on WGL's original application to enter into this service where it specifically approved the Agreement for Services as just and reasonable. Re Washington Gas Light Co., *supra* note 6, 58 P.U.R.3d at 23–24. Once this determination was made the parties were entitled to rely upon it and the Commission should not deviate from that stated position without good reason. But since the agreement specifically recognized the Commission's regulatory authority and the right of the parties to seek changes, and because the Commission has not otherwise abrogated the terms of that agreement in asserting its regulatory authority, we do not consider the Commission's opinion concerning the ineffectiveness of the contract to be fatal.[27]

lation in the manner and to the extent lawfully prescribed by any Federal, State, or local regulatory commission or other authority having jurisdiction. If, during the term of this Agreement, the public regulatory authority having such jurisdiction prescribes rates or charges that are higher or lower than those provided for herein as a replacement thereof, the Seller agrees to continue to furnish the Services provided for in this Agreement, and Purchaser agrees to pay any effective superseding rates or charges for such Services from and after the date when such superseding rates or charges are made effective.

(d) Notwithstanding any other provisions in this Agreement either the Purchaser or Seller shall have the right, at any time during the term of this Agreement, to request the regu-

latory authority having jurisdiction to determine and fix just and reasonable rates and charges for the Services provided for in this Agreement. [Agreement for Services at 5–7.]

27. For further discussion of the *Mobile-Sierra-Memphis* Doctrine on private contracts and public utility regulation, *see, e. g.*, Public Service Commission of the State of New York v. Federal Power Commission, F.2d, (D.C.Cir., No. 24, 716, Mar. 25, 1974, slip op. at 56–76) ; Borough of Lansdale, Pennsylvania v. Federal Power Commission, 494 F.2d 1104 at 1112–1117 (D.C.Cir. 1974) ; Richmond Power & L., Richmond, Ind. v. Federal Power Com'n, 156 U.S.App.D.C. 315, 481 F.2d 490, cert. denied, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973).

## VI

The remaining issue, and the one that is crucial, is whether the approved rates are reasonable, just and nondiscriminatory. The rates were approved over Watergate's objection that WGL received an adequate profit at the previously approved rates and that WGL's methodology for computing the new rates was defective in that it included an item of profit in two of its cost items, thus failing to justify an increase in required revenues. Watergate also claimed that WGL had violated the terms of its contract by including in its formulations a cost of facilities figure which substantially exceeded the $1,650,000 contractual limitation on that expense.

WGL developed its proposed new rates by taking the identical formula used in the original Agreement for Services with Watergate and updating the figures. That formula included an assured profit, or contribution to joint costs, on the Watergate service based upon two components; viz., the cost of gas and the facilities charge. The gas provided the Watergate project is priced at the same rate as that charged WGL's interruptible gas customers, which charge includes the cost of the gas to WGL plus a profit. The facilities charge includes the repayment of the cost incurred by WGL's lessor in building the facilities to provide the services in question and is calculated on a percentage of the amount spent on facilities sufficient to amortize the expense, plus interest and a profit (return on investment).

WGL priced the gas for the Watergate service at the same rate it proposed to charge its interruptible gas customers. Watergate objected to this methodology of pricing on the ground that WGL was making an adequate profit under the old rates and was not entitled to an increase. Watergate also argued that the inclusion of profit on an item listed as an element of cost was improper and that the gas should be priced at its cost to WGL alone since it was only a fuel used in producing the steam and chilled water sold to Watergate.

The Commission rejected these contentions for the following reasons:

1) [T]his was clearly the basis used for "costing" gas in setting the original Watergate rates and we reject as inherently improbable, any claim that Watergate did not understand that this was the basis for setting its rate at that time.

2) It·is sensible . . . to expect that the gas used in providing the steam and chilled water will produce revenues in excess of its cost at least equal to the amount which would be produced if the gas were sold at the interruptible rate.

3) [W]e are mindful that WGL faces a severe gas supply shortage. . . . In this situation, the value of the gas used at Watergate is a factor we can and should consider. That gas could be sold elsewhere by the Company, at least at the interruptible rate, and likely at a higher rate. [Excerpts from Formal Case No. 567, Order No. 5571 at 8–9, Mar. 28, 1973.]

The Commission's reasoning and conclusions are sound and adequately supported by the record. Its 1965 order approving the service and setting the initial rates specifically stated that the rate for the gas used at Watergate would be the same as that charged WGL's interruptible gas customers. Re Washington Gas Light Co., *supra* note 6, 58 P.U.R.3d at 13. At that time the Commission pointed out that were WGL to charge Watergate any less it might be subject to criticism that it was giving Watergate preferential treatment and discriminating against its other customers. Providing gas to the Watergate service requires essentially the same expenditure of effort on the part of WGL as is required to provide gas to WGL's interruptible customers and it is supplied on very similar terms and conditions. Insofar as the gas shortage is concerned, its existence, well known to the public, is certainly a relevant consideration. Consequently, the findings concerning the cost of gas

were not arbitrary, capricious or unreasonable and find adequate support in the record.

■ WGL derived the new facilities charge by multiplying the total cost of facilities to date ($2,210,058) by a factor of 9.75%. It justified this method of computation by pointing out that the margin of the facilities charge over the lease cost to WGL was approximately the same under both the present and the proposed rates, $31,140 (present) vs. $31,657 (proposed). The Commission approved this methodology finding that "this is a reasonable way in the circumstances of this case to measure the appropriate contribution to joint costs which these facilities should provide." Formal Case No. 567, Order No. 5571 at 8, Mar. 28, 1973. The Commission also examined the substantial increase in cost of facilities over the amount originally estimated insofar as it was caused by the installation of a different kind of chiller than originally planned and made the following finding:

> We view the subject, much disputed in the record, of the Company's decision to install a centrifugal chiller rather than an absorption chiller in the context of this question of the appropriate facilities charge. The question, as we see it, is whether the Company is recovering something more than its reasonable costs. If the choice of a centrifugal chiller was improvident, then reliance on the cost of that facility in setting rates is improper.

We have carefully reviewed the record on this subject and find that the Company's choice was not inappropriate. There were questions of installation difficulties and operating costs presented in connection with the decision as to type of unit. The Company's exercise of business judgment on these questions was not unreasonable and we will not second guess them on their choice. [*Id.* at 8–9.]

Watergate raises several objections to the Commission's approval of the manner in which WGL altered the facilities charge. It first argues that WGL should not have been permitted to abrogate the terms of its original contract with Watergate by including a cost of facilities exceeding the $1,650,000 ceiling set in the contract. It also contends that WGL should not have been permitted to raise the facilities charge factor from 9% to 9.75%. Additionally, it asserts that the Commission failed to explain the reasons underlying its conclusion that the new facilities charge is reasonable and repeats its argument that WGL failed to show the need for any redetermination of its rates because it earns an adequate profit under the old rates.

The contract does indeed contain in Section 6(a) a $1,650,000 ceiling on the cost of facilities.[28] Section 6(b) qualifies that limitation, however, as follows:

> The first of the Buildings to be erected shall be Building No. 2 as identified

---

28. Sec. 6. *Adjustment of Rates* . . .

\*    \*    \*    \*    \*

(a) The rates in Exhibit C are predicated on an original investment of $1,650,000 in the plant and equipment for furnishing the Services provided for in this Agreement (exclusive of facilities to deliver gas to the outlet side of Seller's gas measuring equipment). The $1,650,00 represents the estimated cost of designing, furnishing, and installing the equipment specified in Exhibit D attached hereto under the conditions set forth in Exhibit E attached hereto. If the actual cost is less than $1,650,000, the rates in this Agreement shall be adjusted for the difference between such cost and the $1,650,000. In

making any adjustment under this subsection (a) the actual cost of construction, but not to exceed $1,650,000 under the conditions specified above, shall be substituted for such estimated cost and the method of calculating the new rates shall be the same as the method used in arriving at the rates set forth in Exhibit C attached hereto. Such method is set forth in Exhibit C–1 attached hereto. Purchaser shall be entitled to a ·refund of the difference between amounts paid pursuant to the initial rates provided in Exhibit C to this Agreement and those that may be developed under this subsection (a) if the actual cost of construction is less than $1,650,000. Any such refund shall bear in-

on Exhibit A hereto, and the work incident to such erection shall be prosecuted with all due diligence and shall be completed on or prior to December 1, 1965. In the event of (i) failure to construct any of the Buildings subsequent to the first to be erected; or (ii) delay of more than ten months from the completion of one Building to the beginning of construction of the next without the consent of the Seller, which shall not be unreasonably withheld; or (iii) construction of one or more of the Buildings having different heating or cooling demands than those specified in Section 4 hereof, or (iv) failure to complete the Watergate Project within three years and ten months from the date of completion of the first of the Buildings to be erected, the rates set forth in Exhibit C shall be adjusted in accordance with the changes occasioned by occurence [sic] of any of the events described in (i), (ii), (iii), or (iv) by applying the method used in arriving at the rates set forth in Exhibit C. [Agreement for Services at 5–6.]

The record reveals a breach by Watergate of the latter two provisions of the contract. WGL attributed certain cost overrides to Watergate's breaches and to changed circumstances during the delays. Specifically, Watergate's failure to complete the complex within the contemplated three years and ten months from December 22, 1965, the date when the first building was completed, resulted in WGL's loss of its fixed-ceiling contract with the William H. Singleton Company, thereby increasing the facilities cost. The change in plans from one building—an apartment—to two, an apartment building and an office building, requiring different heating and cooling capacities, necessitated a change in facili-

ties to handle the modified requirements. These alterations were in addition to the changed circumstances resulting from the long delay in amending the plans and carrying them to completion. In addition, an interim advance in technology made a different and more efficient kind of unit, not previously available, more desirable. The Commission found this new unit, a centrifugal chiller, to be a sound and appropriate choice.

On the basis of this evidence there is adequate support in the record for the decision to permit WGL to use a facilities cost exceeding $1,650,000. The increased costs, in turn, were explained in WGL's testimony and were accepted by the Commission. Indeed, the item precipitating the largest increase in costs, the switch from an absorption to a centrifugal chiller, was specifically approved by the Commission. Accordingly, we affirm the Commission's determination that WGL's increased cost of facilities was reasonable and just.

■ We also arrive at the same conclusion with respect to the factor applied to that cost of facilities, utilized to derive the facilities charge itself. The original contract formula called for the application of a 9% factor to the cost of facilities, whereas now WGL has applied a 9.75% factor. The justification for such action is that the resultant figure gives WGL approximately the same margin of gross profit over the lease cost [29] as was derived under the old leasing arrangement originally approved.[30]

■ As the Commission said, both parties to this dispute agreed that "a reasonable rate for steam and chilled water service should include some measure of profit

terest at the rate of 5% per annum from the date the charges were paid to Seller until refunded. Purchaser shall have the right of access to review an audit all contracts and records of costs of Seller relative to the cost of construction. The limitation of $1,650,000 applies only to the initial construction cost and not to the cost of any subsequent replacements. [Agreement for Services at 5.]

29. WGL leases the production equipment installed at Watergate from United States Leasing Corporation. The equipment was secured from the Singleton Company.

30. WGL argues that the $517.00 difference is de minimus. It explains that the slight increase in margin profit was necessary in order to recover additional costs incurred in leasing plant equipment.

for the Company on that service." [31] The question was how to arrive at a reasonable amount of profit, or more accurately, a reasonable contribution to joint costs that the Commission would allow. Watergate wished to apply a traditional return on investment standard which would have the effect of limiting WGL's profit on the service to that derived at the present rates. WGL uses the same methodology as it used in the original proceeding to justify the amount of profit it should receive, producing a margin of facilities charge over its lease cost almost identical with that under present rates. The Commission found, as it had before, that WGL's methodology was a reasonable way to measure the approximate contribution to joint costs which the facilities should provide.

We conclude that in this rate design proceeding the record fully supports the Commission's determination that the methodology used to compute the new rate schedules and the regulations proposed by WGL for the steam and chilled water service to Watergate are just, reasonable and nondiscriminatory. The Commission's decision is, therefore,

Affirmed.

31. Formal Case No. 567, Order No. 5571 at 4, Mar. 28, 1973.