TENANTS OF 3039 Q STREET,
N.W., Petitioners,

v.

DISTRICT OF COLUMBIA RENTAL
ACCOMMODATIONS COMMISSION,
Respondent,

Tribby Properties, Inc., and Thomas D.
Walsh, Inc., Intervenors.

No. 11276.

District of Columbia Court of Appeals.

Argued May 19, 1977.

Decided Sept. 1, 1978.

Myles G. Glasgow, Washington, D. C.,
with whom Joseph Cooney, Washington, D.
C., was on the brief, for petitioners.

Michael A. Cain, Asst. Corp. Counsel,
Washington, D. C., with whom Louis P.
Robbins, Principal Asst. Corp. Counsel, and
John C. Salyer, Asst. Corp. Counsel, Wash-
ington, D. C., were on the brief, for respon-
dent.

Lawrence L. Bell and Rosalyn B. Bell,
Washington, D. C., were on the brief, for
intervenors.

Before KELLY, KERN and HARRIS,
Associate Judges.

HARRIS, Associate Judge:

The tenants of 3039 Q Street, N.W., seek
review of an order of the Rental Accommo-
dations Commission (Commission).[1] In de-
termining the extent of a permissible rent
increase for the Q Street property, the

1. The Commission originally was created by the District of Columbia Rental Accommodations Act of 1975, which has expired (two years after its effective date) and been superseded in the interim.

Commission allowed the owner of the building, intervenor Tribby Properties, Inc. (Tribby), to utilize a depreciation charge in computing its "rate of return" on the building pursuant to the then-effective Rental Accommodations Act of 1975. *See* D.C. Code 1977 Supp., § 45–1644. The allowance of this charge resulted in a larger rent increase than would otherwise have been permissible. The tenants argue on appeal that the Commission misconstrued the specific statutory language relating to depreciation. *See id.,* § 45–1644(a)(3)(B)(4)(iv). We conclude that the Commission's decision is supported by the language of the former Code provision, and also is reasonable in light of the purpose of the Rental Accommodations Act. Accordingly, we affirm.

I

The Rental Accommodations Act was promulgated with the goal of stabilizing rents in the District of Columbia by limiting landlords to an eight percent "rate of return" on a rental unit. *See id.,* § 45–1644(a). In determining the "rate of return," the following formula was to have been used. The maximum possible rental income from a housing accommodation was added to all other income derived from that accommodation. *See id.,* §§ 45–1644(a)(3)(B)(1) and (2). From that amount, vacancy losses and uncollected rents were subtracted. *See id.,* § 45–1644(a)(3)(B)(3). This left the gross income. In order to compute net income, the following items then were subtracted from the gross income: operating expenses, property taxes, management fees, and amortized costs of capital improvements. *See id.,* § 45–1644(a)(3)(B)(4)(i)–(iii) and (v). One additional income reduction, a depreciation charge (computed on a straight-line basis) also could be made; it is the source of the

controversy in this case. As to depreciation, the statute provided:

[N]o more than two percent of the assessed market value of the housing accommodation may be deducted in any one year as a depreciation expense, unless and to only the extent any additional amounts are approved by the Rent Administrator pursuant to subsection (c) of section 45–1645.[2] [*See id.,* § 45–1644(a)(3)(B)(4)(iv).]

Once the net income thus had been computed, the rate of return was to be determined by dividing the net income by the assessed market value. *See id.,* § 45–1644(a)(3)(B)(5).

A landlord seeking to achieve an eight percent "rate of return" thus was confined to a statutory formula in determining the extent of a permissible rent increase. Under the provisions of the former § 45–1644(a), the landlord automatically could raise rents by a certain percentage. If the resulting increase in income was still not sufficient to provide an eight percent return, the landlord could petition the Rent Administrator to exercise his discretion and allow additional increases. *See id.,* § 45–1649.

II

In this case, intervenor Thomas D. Walsh, Inc., filed a petition for an increase as agent for intervenor Tribby. The tenants contested the request, and an examiner conducted a hearing. In determining whether or not the eight percent "rate of return" had been achieved, evidence as to the building's tax depreciation status was introduced. The building was constructed in 1924, and Tribby acquired it in 1930. In the intervening years, the building had been fully depreciated by Tribby for tax purposes.

---

**2.** Subsection (c) of § 45–1645 provided that:

Where, in the computation of a rate of return, a landlord seeks to deduct depreciation expenses in excess of two percent of the assessed market value of the housing accommodation, he shall first file with the Rent Administrator a petition to allow such excess to be deducted. If the Rent Administrator

determines that such excess or part thereof is justified, he may permit to be deducted the same or so much thereof as he determines to be justified. The petition shall contain such information as the Rent Administrator may require including but not limited to what if any depreciation of the housing accommodation has been claimed for tax purposes.

The Rent Administrator denied any depreciation deduction for the building. However, because the Act allowed consideration of a depreciation charge on the assessed value of the "housing accommodation," and because such an accommodation was defined as encompassing both the building and the land appurtenant thereto, *see id.,* § 45–1641(e), the Administrator did allow an expense charge of two percent of the value of the land for depreciation. The end result was a decision that rents could be increased, but not to the extent which would have been permissible if depreciation on the building also had been taken into account. Other issues, not relevant here, also were decided by the Administrator.

Both sides appealed to the Commission. The Administrator's decision was affirmed in part and reversed in part. The Commission concluded that the landlord was entitled to subtract two percent of the assessed value of both the building and its site as a depreciation expense pursuant to § 45–1644(a)(3)(B)(4)(iv), notwithstanding the fact that the building had been fully depreciated for tax purposes. Furthermore, the Commission decided that there is "no grant of discretion to the Rent Administrator by which he can deny a landlord a claimed depreciation expense" regardless of how long the building had been owned or its status for tax purposes.

### III

■■ The Commission was created originally to administer the Rental Accommodations Act of 1975. *See id.,* § 45–1632(a). Although the ultimate duty of interpreting that Act rests with this court, we are guided by the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Thus, an agency's interpretation of a statute should be followed when it "is reasonable and does not contravene the language or legislative history of the statute." *Coakley v. Police &*

*Firemen's Ret. and Relief Board,* D.C.App., 370 A.2d 1345, 1349 (1977). *See also Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153–54, 67 S.Ct. 245, 91 L.Ed. 136 (1946); *Billings v. District Unemployment Compensation Board,* D.C.App., 367 A.2d 116, 118 (1976); *Watergate Improvement Associates v. PSC,* D.C.App., 326 A.2d 778, 785 (1974). Reviewing the case in this light, we conclude that the construction of the depreciation provision adopted by the Commission, which disallowed any discretion on the part of the Rent Administrator to deny or lessen a landlord's claimed two percent depreciation charge, is not unreasonable and does not "contravene . . . the statute." *See Coakley v. Police & Firemen's Ret. and Relief Board, supra,* at 1349.

### IV

The concept of depreciation recognizes the deterioration and lessening in value of an asset arising from age and use. Different methods have been established to determine the rate at which an asset deteriorates. In the instant case, the Act allowed subtraction of a charge for depreciation, but did not make clear the method to be used in calculating that item.

The statute instructed the building owner to subtract from income "depreciation expenses (computed on a straight line basis) . . .." *See id.,* § 45–1644(a)(3)(B)(4)(iv). The straight-line method is one commonly used for tax purposes. This approach first requires that the useful life of a building be estimated from the time of its construction or purchase. The cost of the building, less the anticipated salvage value at the end of the useful life, is divided by the number of years of useful life. The dollar value result is deducted each year to take account of depreciation. *See* Income Tax Regulations, 1977, § 1.167(b)–1. For tax purposes, straight-line depreciation deductions are allowed only for the length of the useful life. However, when the reference to the straight-line deduction of a depreciation expense in the rent control area is read in its statutory context, it is apparent that the statute did not contemplate the tax or accounting understanding of the term.

The provision directed the use of the straight-line method, but limited the deduction to "two percent of the assessed market value of the housing accommodation . .." D.C.Code 1977 Supp., § 45–1644(a)(3)(B)(4)(iv). As noted, when depreciating a building for tax purposes, one deducts annually a fixed percentage (often more than two percent) of the purchase price less the salvage value. Under the Rental Accommodations Act, the landlord annually could claim as a depreciation charge (or "expense") up to two percent of the current value of the property. Furthermore, tax depreciation is limited to the building. The rent control statute allowed the landlord to deduct up to two percent on the "housing accommodation," which specifically was defined as encompassing both the building and the land. See id., § 45–1641(e). Given the presence of these conflicting concepts with reference to the language of the provision under review, it was not unreasonable for the Commission to have construed the statute as automatically allowing a charge or deduction of two percent of the assessed market value of the overall housing accommodation, regardless of the building's depreciation status for income tax purposes.

■ The tenants argue that tax methods of calculating depreciation should be applicable here. They would have us construe the two percent limit as the maximum depreciation deduction available pursuant to § 45–1644(a)(3)(B)(4)(iv), rather than as an automatic allowance.[3] The two percent calculation, petitioners contend in their brief, is simply "the ceiling under which the straight line depreciation expense for most buildings would fit," and was not a method of establishing the size of the deduction. Furthermore, they argue, since tax methods for taking straight-line depreciation deductions should be applicable and since the landlord has taken all allowable depreciation deductions for tax purposes, he should not be permitted any deduction for purposes of the rent control statute.[4]

3. The statute states that "[n]o more than two percent of the assessed market value of the housing accommodation may be deducted . . .." The tenants rely on this language for the position that the two percent figure is a ceiling on possible deductions and that the Rent Administrator therefore had discretion to grant a smaller deduction or to deny it entirely. It is our conclusion, however, that it is only when the landlord seeks a greater than two percent deduction that the Rent Administrator has the discretion to examine such a request. See D.C.Code 1977 Supp., § 45–1645(c). That provision (see note 2, supra, for text thereof) specifically instructed the Rent Administrator to determine whether the additional deduction was "justified." The provision in question, § 45–1644(a)(3)(B)(4)(iv), contained no language indicating a similar grant of discretion to the Rent Administrator to reduce depreciation as an expense item.

4. The dissent focuses on the word "expenses" in the relevant statute, apparently suggesting that depreciation, to fall properly within the meaning of the statute, must be a clearly identifiable and distinct business expense such as operating expenses for electricity, water, and gas. Even in the tax sense, depreciation is not a true "expense" of such a nature, for it requires no outflow of cash which is readily quantified. Rather, it reflects an arbitrary method of measuring the diminution in value of a building over time, a diminution which continues as long as the building is usable.

The legislative history of the Act, while not a model of clarity, provides some support for the conclusion that the depreciation deduction permissible under the Act was designed to offset two of the landlord's true "expenses" which are not otherwise allowable, namely, principal and interest payments on his mortgage. Councilman Barry, the sponsor of the amendment creating the depreciation deduction, when asked why the landlords needed "another break" in addition to the relief afforded by allowing a tax deduction for depreciation, stated:

In the housing business, the main thing that makes you go in debt or stay afloat is cash flow. Depreciation [for tax purposes] is a mechanism whereby those who have a sizeable amount of monies or properties use depreciation as an offsetting factor in reducing the amount of your net taxable income. It is not a cash flow situation.

If you notice here, you don't have any formula which provides for the interest payments which his cash flow pays. We don't have a formula that provides for the payment of principal. Cash flow.

Every month you have to pay your mortgage if you own the building, principal and interest. Nowhere in this formula then does that allow you to do that, actual dollars in the till. [D.C. Council meeting of June 10, 1975, Ex. 4, at 8–9.]

■ We are not persuaded, however, that the subtraction "of no more than two percent of the assessed market value of the housing accommodation" is meant to be an arbitrary ceiling on depreciation deductions determined according to tax principles. In light of the conflicting language within the statutory provision, and recognizing the deference which this court properly must afford to a decision of the Commission, we affirm its construction of the depreciation provision. In this case, there are no "compelling indications," *see Red Lion Broadcasting Co. v. FCC, supra,* that the decision of the Commission is wrong. On the contrary, we believe that tax principles are not necessarily relevant in construing a statute which was designed in an effort to stabilize rents. To hold otherwise would create a situation in which rents would vary from building to building depending on how long the landlord had owned the building, or on the status of his income tax situation. As long as a building is being used, it is depreciating (with its replacement cost inexorably escalating), and there is no reason evident in the statute or in its legislative history to compel an interpretation which would permit a depreciation "expense" to some landlords and not to others in the computation of permissible rents.

*Affirmed.*

KELLY, Associate Judge, dissenting:

Respondent Commission argues in this case that the statutory language of § 204(a)(3)(B)(4)(iv) of the Rental Accommodations Act of 1975 is *clear and unambiguous.* That statute provided in pertinent part:

(iv) depreciation expenses (computed on a straight line basis) of no more than two percent of the assessed market value of the housing accommodation may be deducted in any one year as a depreciation expense, unless and to only the extent that any additional amounts are approved by the Rent Administrator pursuant to subsection (c) of section [205] of this act;

. . .

Interpretation of this supposedly clear language led the Commission to conclude that a "depreciation expense" should become a "depreciation allowance," reasoning in a footnote to its decision that

The City Council adopted a policy that apparently trades off the arbitrary two percent for the inclusion of land value in the base from which the "expense" is calculated. Since the value of land is included, depreciation "expense" is actually a misnomer and the Commission prefers to speak of an "allowance" of two percent of the total assessed value. Note, however, that depreciation in excess of two percent as allowed under Section 12.-10 of the Regulations, when documented by showing compliance with Internal Revenue guidelines, does not include depreciation allowance on the land.

Additionally, and inconsistently, the Commission argues on appeal that it is unclear why the parenthetical phrase "(computed on a straight line basis)" was included in the statute;[1] hence, that language should be discounted in interpreting the statute.

In my judgment, when the statute speaks of depreciation expenses it speaks in the

Thus it appears that the purpose of the amendment allowing the deduction of depreciation "expenses" was to allow a landlord to some extent to offset mortgage payment cost, an entirely different purpose from that which depreciation is designed to accomplish in the income tax context. Accepting the offsetting of mortgage payment costs as at least a partial goal of the amendment, it would be illogical to terminate that deduction at the end of the useful life of the building as computed for tax purposes under the straight-line method. Long after a building has been fully depreciated for tax purposes, the landlord still might be making mortgage payments. Thus the legislative

history of the Act does not persuade us that it was unreasonable for the Commission not to limit the period during which a depreciation expense should be subtracted in the rent formula to the useful life of the building for tax purposes. Rather, we believe it was wholly reasonable for the Commission to conclude that it would serve the purpose of the amendment creating the depreciation deduction to allow a depreciation expense as long as the building is usable and is actually diminishing in value due to its inevitable physical deterioration over time.

1. The phrase was added after the Mayor had vetoed the first rental accommodations bill.

traditional sense of that language; namely, that to the extent a property has not been fully depreciated, a deduction for depreciation [in this case of not more than 2% of the assessed market value] may be taken. Moreover, depreciation computed on a straight-line basis is a well recognized concept in other areas of the law, and the parties agree on its meaning. Hence, under our standard of review, *e. g., Legislative Study Club, Inc. v. D. C. Board of Zoning Adjustment,* D.C.App., 359 A.2d 153, 155 (1976); *Taylor v. D. C. Board of Zoning Adjustment,* D.C.App., 308 A.2d 230, 232 (1973), I would hold that the Commission's decision is inconsistent with the statute and reverse.