**WATERGATE EAST, INC.,
et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA PUBLIC
SERVICE COMMISSION,
Respondent.**

**Washington Gas Light Company,
Intervenor.**

**No. 94–AA–1187.**

District of Columbia Court of Appeals.

Argued June 21, 1995.
Decided July 17, 1995.

---

Tanja M. Shonkwiler, with whom Wallace L. Duncan, Thomas L. Rudebusch, Michael R. Postar, and David H. Cox, Washington, DC, were on the brief, for petitioners.

Pressley R. Reed, Jr., with whom Daryl L. Avery and Edwin E. Huddleson, III, Washington, DC, were on the brief, for respondent.

L. Patrice Latimer, with whom John K. Keane, Jr., Excetral K. Caldwell, and Douglas V. Pope, Washington, DC, were on the brief, for intervenor.

Before TERRY and FARRELL, Associate Judges, and TIGNOR, Associate Judge of the Superior Court of the District of Columbia.*

FARRELL, Associate Judge:

The Public Service Commission of the District of Columbia (the Commission) rejected petitioners' claim that intervenor Washington Gas Light Co. (WGL) had overcharged them for the cost of fuel during a 17–year period. In this court, petitioners challenge the Commission's decision on several grounds, among which is that the Commission failed to adhere to the "filed rate" doctrine. We reject this and petitioners' related contentions, and affirm.

## I.  Procedural History

On November 22, 1993, petitioners[1] filed a complaint with the Commission alleging that from 1976 through 1993, WGL overbilled them by more than $2.1 million by charging them a cost for fuel different from that set forth in WGL's contract rate for the Watergate complex (the Watergate). WGL's contract rate for the Watergate for these years was set forth in a schedule, Rate Schedule W, filed by WGL with the Commission in 1975. The complaint asserted that WGL had calculated the Watergate's fuel adjustment based upon Rate Schedule No. 3, the schedule applicable since 1976 to WGL's "interruptible" customers, rather than upon an earlier Rate Schedule I pertaining to the same class of customers, and to which Rate Schedule W referred. Petitioners alleged that WGL's billing of the Watergate for fuel based on Rate Schedule No. 3 violated the "filed rate" doctrine and D.C.Code § 43–529 (1990),[2] and that petitioners had not received adequate notice that WGL's rate for the Watergate

might be changed. On December 3, 1993, WGL filed an answer to the complaint.

In *Watergate Complex Council v. Washington Gas Light Co.*, Formal Case No. 932, Order No. 10419 (Pub.Serv.Comm'n April 29, 1994), the Commission issued an opinion dismissing petitioners' complaint without a hearing. It determined that once WGL, in conformance with the rate increase for interruptible customers granted in *In re Washington Gas Light Co.*, Formal Case No. 647, Order No. 5833, 16 PUR 4th 261 (1976), had filed Rate Schedule No. 3 with the Commission, Rate Schedule I ceased to exist—regardless of whether Rate Schedule W still referred to it. The Commission further found that, in early 1976, petitioners received adequate notice that in the proceeding culminating in Order No. 5833, WGL's rate for the Watergate might be changed. And it concluded that neither the filed rate doctrine nor D.C.Code § 43–529, its statutory counterpart, had been violated, because Rate Schedule No. 3 had superseded Rate Schedule I.

On May 31, 1994, petitioners filed with the Commission an application for reconsideration of Order No. 10419. In *Watergate Complex Council v. Washington Gas Light Co.*, Formal Case No. 932, Order No. 10457 (Pub. Serv.Comm'n July 15, 1994), the Commission denied the application, holding that D.C.Code § 43–608 did not require the Commission to provide a formal hearing on petitioners' complaint, and reiterating that "the rates set in [Order No. 5833] were intended to apply to [the] Watergate" and that pursuant to Order No. 5833 and WGL's filing with the Commission of Rate Schedule No. 3, "Rate Schedule No. 3 supplanted Rate Schedule I for purposes of [the purchased fuel adjustment clause of] Rate Schedule W."

Petitioners then filed the instant petition for review of Orders No. 10419 and 10457.

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

1. Petitioners are: Watergate East, Inc., Watergate South, Inc., Watergate West, Inc., Lincoln Property Company, Watergate Investors Limited Partnership, Watergate Management Corporation, Nikko Company, and Trusthouse Forte. According to petitioners, Watergate Investors Limited Partnership is a successor in interest; Nikko

Company and Trusthouse Forte own the Watergate Hotel; and Lincoln Property Company is the managing agent for John Hancock Mutual Life Insurance.

2. The complaint cited D.C.Code § 43–612, but as § 43–612 does not even arguably concern the filed rate doctrine, petitioners undoubtedly meant D.C.Code § 43–529.

## II. The Facts

### A. WGL's service to the Watergate

WGL is a public utility with three types of customers: (1) "firm" customers, (2) "interruptible" customers, and (3) "steam and chilled water" customers. Firm customers are customers whom WGL supplies with natural gas. Interruptible customers are customers whom WGL supplies with fuel; for any given period, this fuel may be, in WGL's discretion, either natural gas or a substitute fuel (usually oil). *See Office of People's Counsel v. Public Serv. Comm'n,* 482 A.2d 404, 412 (D.C.1984). Steam and chilled water customers are customers whom WGL supplies with steam and chilled water. The Watergate is WGL's only steam and chilled water customer. *See Watergate Complex Council v. Washington Gas Light Co.,* Formal Case No. 932, Order No. 10457 at 3 n. 1 (Pub.Serv.Comm'n July 15, 1994).

WGL supplies steam and chilled water to the Watergate for heating and air conditioning. To generate steam and chilled water, the plant facilities, which are located on the Watergate's premises, use natural gas as fuel. Oil is used as a substitute fuel at the Watergate whenever WGL suspends gas service to its interruptible customers. WGL's rate for the Watergate contains two main components: "demand" charges and "commodity" charges. *See In re Washington Gas Light Co.,* Formal Case No. 922, Order No. 10307 at 199, 1993 WL 565426 (Pub.Serv. Comm'n Oct. 8, 1993). Demand charges cover the wages of workers who operate and maintain the plant facilities on the Watergate's premises. Commodity charges cover the cost of natural gas and, when substituted, oil.

### B. WGL's contract rate for the Watergate

On July 29, 1964, WGL and the Watergate entered into a contract entitled "Agreement for Services" which set forth WGL's proposed rate for the Watergate. On March 18, 1965, the Commission approved the contract between WGL and the Watergate, subject to minor conditions. *See In re Washington Gas Light Co.,* Formal Case No. 503, Order No. 4902, 58 PUR 3rd 1, 5, 23–24 (1965), *aff'd per curiam sub nom. Association of Fair Competitive Practices in Air Conditioning, Inc. v. Public Serv. Comm'n,* 125 U.S.App.D.C. 361, 372 F.2d 934 (1967). On a number of occasions from 1965 to the present, the Commission has, on application by WGL, modified WGL's rate for the Watergate. *See, e.g., Watergate Improvement Associates v. Public Serv. Comm'n,* 326 A.2d 778, 791–92 (D.C. 1974).

On March 21, 1975, WGL filed with the Commission a schedule, Rate Schedule I, setting forth WGL's rate for interruptible customers. On September 29, 1975, WGL filed with the Commission another schedule, Rate Schedule W, which set forth WGL's rate for the Watergate. The "purchased fuel adjustment" clause of Rate Schedule W revealed that WGL's commodity charges for the Watergate would be calculated partly by reference to the rate set forth in Rate Schedule I. Specifically, the commodity charge for the Watergate would increase or decrease each month along with that month's "[ ]cost[ ] for fuel input." Cost for fuel input, in turn, would be calculated in part by "[p]ric[ing] therms of gas used during the billing month at the billing month's rate per therm for [WGL]'s Schedule 'I' rate minus $0.0324 per therm."

On September 30, 1975, WGL filed an application with the Commission requesting a rate increase of over $7.4 million. Order No. 5833, 16 PUR 4th at 262. On January 5, 1976, the Commission published in the D.C. Register a Public Notice and Notice of Prehearing Conference in Formal Case No. 647, which stated that WGL was proposing "three new firm rate schedules and a substantially amended interruptible schedule." 21 D.C.Reg. 3360–61 (1976). The public notice continued:

> Interruptible customers' rates would be increased to $.20 for each therm of gas purchased.

> In addition, [WGL] proposes numerous changes in its tariffs.... And [WGL] proposes to modify the purchased gas adjustment provision of its tariff.

> Notice is hereby given that a prehearing conference has been scheduled [giving

time, date, and place]. The Commission advises that the issues in this proceeding may encompass not only [WGL]'s rate proposals, but also increases or decreases in any of [WGL]'s rates and other changes in rate design or tariffs.

21 D.C.Reg. 3361.

In Order No. 5833, the Commission granted WGL a rate increase of over $6.7 million, including an increase in the rate for interruptible customers. Order No. 5833, 16 PUR 4th at 262, 281–83. In the same case, the Commission addressed the Watergate by name, declaring that "determinations herein of [WGL's] revenue need will include[, along with WGL's other operations,] the results of [WGL]'s Watergate chilled water and steam services." [3] *See* 16 PUR 4th at 265 n. 5.

On October 29, 1976, WGL filed with the Commission a schedule, Rate Schedule No. 3, effective the following day, which conformed to the rate increase for WGL's interruptible customers previously granted by the Commission in Order No. 5833. Rate Schedule 3 thus replaced Rate Schedule I as the schedule applicable to WGL's interruptible customers. *See* Order No. 10457 at 17.

WGL did not, until October or December of 1993, file with the Commission a schedule replacing Rate Schedule W as the schedule applicable to the Watergate. Thus, the purchased fuel adjustment clause of Rate Schedule W, indicating that WGL's commodity charges for the Watergate would be calculated partly by reference to Rate Schedule I, remained on file with the Commission until late 1993. From 1976 to 1993, WGL—without protest—based the Watergate's commodity charges on Rate Schedule No. 3 rather than Rate Schedule I.

---

**3.** In full, this passage read:
> Evidence submitted by the staff touched on the question of whether the revenues, expenses, and rate base associated with [WGL]'s chilled water and steam operations for the Watergate complex of buildings should be included in [WGL]'s other operations in determining its revenue need. It may possibly be that, as a matter of regulatory policy, [WGL]'s Watergate operations should be separated out. But the [C]ommission has previously made it clear that it considered Watergate results to be

## III. Discussion

### A. Standard of review

■ This court's review of an order of the Commission, governed by D.C.Code § 43–906 (1990), is "limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." *Id.* This scope of review "is the narrowest judicial review in the field of administrative law." *Office of People's Counsel v. Public Serv. Comm'n,* 610 A.2d 240, 243 (D.C.1992) (citations and internal quotation marks omitted). "Of course, the [Commission] must fully and carefully explain its ruling," *id.* at 243; but once it provides such an explanation, the petitioner challenging its order assumes "the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken." *See Washington Gas Light Co. v. Public Serv. Comm'n,* 450 A.2d 1187, 1194 (D.C. 1982). Moreover, as § 43–906 implies, this court is bound by the Commission's findings of fact if supported by substantial evidence. *See Watergate Improvement Associates,* 326 A.2d at 783.

### B. Rate Schedule 3 versus Rate Schedule I

■ Petitioners' basic challenge is to the Commission's determination that Rate Schedule No. 3 replaced Rate Schedule I in 1976 in the purchased fuel adjustment governing the Watergate. This determination is not in essence a factual finding, but rather a conclusion about the legal effect of WGL's filings and the Commission's rate determinations in the 1975–76 period. See *infra* part D. But, although we therefore do not give the Commission's conclusion the same defer-

---

an element of [WGL]'s overall public utility functions. See [Order No. 5571]. We are reluctant to change this policy absent a thorough discussion on the record of the arguments for and against its continuation. This record contains no such discussion. Accordingly, our determinations herein of [WGL]'s revenue need will include the results of [WGL]'s Watergate chilled water and steam services.

Order No. 5833, 16 PUR 4th at 266 n. 5.

ence owed factual determinations, we none-theless will sustain it if it is "reasonable [and] based upon factors within the Commission's expertise." *Diamond Int'l Corp. v. Federal Communications Comm'n*, 201 U.S.App.D.C. 30, 33, 627 F.2d 489, 492 (1980).

The Commission determined that when WGL, in late 1975, applied for an increase in its rate for interruptible customers (among others), it was seeking at the same time an increase in its commodity charges, and hence its utility rate, for the Watergate. This fol-lowed from the fact that the Watergate's rate was tied by Rate Schedule W directly to the existing schedule for interruptible customers. Thus, when the Commission granted the re-quested increase and WGL thereafter filed Rate Schedule No. 3 for its interruptible customers,[4] that schedule replaced Rate Schedule I as the applicable referent in the Watergate's purchased fuel adjustment clause.

■ Petitioners counter that since the January 5, 1976 public notice of WGL's rate increase application did not mention either the Watergate or WGL's steam and chilled water customers, the Commission was wrong in concluding that the proposed increase was intended to apply to the Watergate; or—at the very least—it was wrong in finding that the notice adequately informed the Water-gate that its rates might be affected. We are not persuaded. Well before publishing the January 5, 1976 public notice, the Commis-sion had made clear the fact that WGL's commodity charges for the Watergate were based upon WGL's rate for interruptible cus-tomers. In *In re Washington Gas Light Co.*, Formal Case No. 567, Order No. 5571, 99 PUR 3d 139 (1973), the Commission, in granting WGL's application for an increase of WGL's rate for the Watergate, had stated:

> It is sensible ... to expect that the gas used [by WGL] in providing the steam and chilled water [to the Watergate] will pro-duce revenues in excess of its cost at least equal to the amount which would be pro-

duced *if the gas were sold [by WGL] at the interruptible rate. Moreover, this* [WGL's rate for interruptible customers] *was clearly the basis used* for "costing" gas in setting the original Watergate rates and we reject as inherently improbable, any claim that Watergate did not understand that *this was the basis for setting its rate at that time.*

99 PUR 3d at 145 (emphasis added). In-deed, two years before the Commission pub-lished the 1976 public notice, this court, re-jecting a lack-of-notice argument almost identical to the one petitioners now raise, had acknowledged that WGL's rate for the Wa-tergate depended, at least in part, on WGL's rate for its interruptible customers. In *Wa-tergate Improvement Associates*, the Court stated:

> Petitioner correctly points out that WGL's initial application and public notice were captioned as requests for increases in *gas* rates and thus did not clearly indicate that changes in steam and chilled water rates were also being sought. It is important to note, however, that the steam and chilled water rates are partially dependent on the interruptible gas rate charged other WGL customers and to that extent Watergate was on notice that its rates might be changed.

326 A.2d at 786 (emphasis in original).

Finally, of course, Rate Schedule W made explicit reference to the then-existing sched-ule for interruptible customers, and in Order No. 5833 (granting the increase in the inter-ruptible customer rate) the Commission ex-plicitly took into account WGL's provision of chilled water and steam to the Watergate in determining WGL's revenue need. All told, we cannot say that the Commission was un-reasonable in concluding that Order No. 5833 approved an increase in WGL's rate for the Watergate, and that the January 5, 1976 public notice informed petitioners that "the interruptible rate ... would possibly be amended" in Order No. 5833, "thus affecting

---

4. At oral argument, counsel for petitioners em-phasized that the table of contents of WGL's October 29, 1976 conformance filing, see *supra* p. 886, referred to a nonexistent page which was to state the rate for steam and chilled water

customers. We believe this lacuna adds nothing to the conceded fact that WGL did not, until late 1993, file with the Commission a schedule re-placing Rate Schedule W as the schedule appli-cable to the Watergate. *Supra* p. 886.

[the] rate [for the Watergate]." Order No. 10419 at 13.

■ Petitioners seek contrary support from the fact of the parallel 1976 proceeding that explicitly dealt with the Watergate. In *In re Washington Gas Light Co.*, Formal Case No. 648, Order No. 5771 (Pub.Serv. Comm'n March 1, 1976), the Commission approved an application by WGL for an increase in its rate for the Watergate. Petitioners argue that since the Commission published public notice of the proceeding underlying Order No. 5771 and the proceeding underlying Order No. 5833 on the same date, *see* 21 D.C.Reg. 3360–63 (1976), the latter proceeding must have addressed an increase in the rate for interruptible customers only, whereas the Commission "separately" addressed the increase in WGL's rate for the Watergate in Order No. 5771. The Commission persuasively answered this argument, explaining that Orders No. 5771 and 5833 "did not address the same issues and are not comparable." Order No. 10457 at 9. Order No. 5771 did not deal with the issue of what rate (namely, the rate set forth in Rate Schedule No. 3 or that in Rate Schedule I) WGL's commodity charges for the Watergate were to be based on, but rather with the issue of whether WGL was to be allowed to realize a profit when it used oil, rather than natural gas, to generate steam and chilled water for the Watergate.[5] *Id.* By contrast, Order No. 5833 "was a general rate case" in which the Commission explicitly took into account the results of WGL's provision of steam and chilled water to the Watergate in determining WGL's revenue need. *Id.* Though petitioners view this skeptically as a *post hoc* differentiation, the Commission's interpretation of the particular contexts in which its proceedings arose is certainly a matter "within [its] expertise," *Diamond Int'l Corp.*, 201 U.S.App.D.C. at 33, 627 F.2d at 492, and to which we therefore defer. Since, as the Commission reasonably determined, Order No. 5771 was not a comprehen-

sive ruling on increases in WGL's rate for the Watergate, it was not inconsistent with Order No. 5833's approval of an increase not just in WGL's rate for interruptible customers, but in its rate for the Watergate as well.

## C. The filed rate doctrine

■ In what is really only a variation on the previous arguments, petitioners contend that the filed rate doctrine required the Commission to base WGL's 1976–1993 commodity charges for the Watergate on Rate Schedule I rather than Rate Schedule No. 3, inasmuch as WGL did not, until 1993, file a schedule replacing Rate Schedule W (incorporating Schedule I) as the tariff applicable to the Watergate.

■ The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate . . . regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). As the Commission pointed out, Order No. 10457 at 12, the doctrine acts as a check on the courts, requiring them to defer to the ratemaking agency's determination that a filed rate is (or is not) reasonable. *See Arkansas Louisiana Gas Co.*, 453 U.S. at 578–80, 101 S.Ct. at 2930–32 (utilizing filed rate doctrine to strike down a lower court's substitution of its judgment for that of the ratemaking agency concerning what rate is "reasonable"); *Montana–Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 250–52, 71 S.Ct. 692, 694–96, 95 L.Ed. 912 (1951) (same). This use furthers the doctrine's oft-stated purpose of "preserv[ing] . . . the agency's primary jurisdiction over reasonableness of rates. . . ." *Arkansas Louisiana Gas Co.*, 453 U.S. at 577, 101 S.Ct. at 2930 (citation omitted).

■ In this case, of course, there is no question that the Commission considers the rate charged the Watergate by WGL since 1976 to be reasonable. Petitioners, however,

---

5. *See* Order No. 5771 at 4 ("[WGL] seeks to modify the PFA [purchased fuel adjustment] so as to permit it to realize at least 3.24 cents per therm 'profit' regardless of whether gas or oil is used"); *id.* at 4–7. As the Commission recognized, prior to its issuance of Order No. 5771,

"the use of oil [to generate steam and chilled water for the Watergate] provided no opportunity for profit [for WGL]." Order No. 10457 at 9; *see* Order No. 5771 at 4 ("the current PFA [purchased fuel adjustment] does not operate to permit [WGL] a profit on the use of oil").

point to another purpose of the doctrine which they say the Commission contravened by refusing to recognize the continuing application of Rate Schedule W to the Watergate. That purpose is exemplified by *Electrical Dist. No. 1 v. Federal Energy Regulatory Comm'n*, 249 U.S.App.D.C. 190, 774 F.2d 490 (1985) (Scalia, J.), in which the United States Court of Appeals invalidated a FERC policy as frustrating a core purpose of the filed rate doctrine—to insure the "predictability" of rates and prevent "unforeseeable liabilities" on the part of utilities and purchasers. *Id.* at 193, 774 F.2d at 493. We of course have no quarrel with this as one of the doctrine's aims.[6] But petitioners' reliance on it in essence merely restates their disagreement with the Commission's characterization of the effect of the 1975–76 proceedings. In January 1976, petitioners were on notice that if the Commission granted WGL's application for (among other changes) an increase in its rate for interruptible customers, WGL's commodity charges for the Watergate, and thus its rate for the Watergate, would also increase. Petitioners thus experienced no unforeseeable liability, a fact of which, we think, their failure to challenge the modified rate for the next seventeen years provides substantial confirmation.

Petitioners' citation to D.C.Code § 43–529, which amounts to a codification of the filed rate doctrine, fares no better.[7] As the Commission explained, since Rate Schedule I had been superseded, "Rate Schedule No. 3 is the only interruptible rate schedule in force which can be used to calculate [the] Watergate's rate under Rate Schedule W." Order No. 10457 at 15. Accordingly, Rate Schedule W's continued reference to Rate Schedule I was, in effect, a dead letter on which petitioners could not—and did not in the intervening years—place any reliance. The "specified" rate under § 43–529 was Rate Schedule 3.

## D. A Hearing

Petitioners contend that D.C.Code § 43–608 required the Commission to provide a formal hearing on their complaint.[8] Section 43–608 provides in relevant part:

> Upon its own initiative or upon reasonable complaint made against any public utility that any of the rates, tolls, charges, or schedules, or services, ... are in any respect unreasonable or unjustly discriminatory, or that any time schedule, regulation, or act whatsoever affecting or relating to ... the production, transmission, delivery, or furnishing of heat, light, water, or power, or any service in connection therewith, is in any respect unreasonable, insufficient, or unjustly discriminatory, ... the Commission may, in its discretion, proceed, with or without notice, to make such investigation as it may deem necessary or convenient. *But no order affecting said rates, tolls, charges, schedules, regulations, or act complained of shall be entered by*

---

6. *See also Illinois Bell Tel. Co. v. Federal Communications Comm'n*, 296 U.S.App.D.C. 197, 199–201, 966 F.2d 1478, 1480–82 (1992) (FCC may not order telephone utilities to refund rates assessed during period prior to FCC's suspension of the filed rates; such retroactive alteration of rate would deny utilities statutorily prescribed notice and opportunity for hearing concerning suspension); *Transwestern Pipeline Co. v. Federal Energy Regulatory Comm'n*, 283 U.S.App.D.C. 116, 122–27, 897 F.2d 570, 576–81 (1990) (where, on the particular facts, a natural gas customer lacked "meaningful notice" of commodity charges, FERC violated filed rate doctrine by ruling that these charges accrued prior to FERC's issuance of order approving the involved application by utility for a rate increase), *cert. denied*, 498 U.S. 952, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990).

7. Section 43–529 reads:
   It shall be unlawful for any public utility to charge, demand, collect, or receive a greater

or less compensation for any service performed by it within the District of Columbia, or for any service in connection therewith, than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, or to demand, collect, or receive any rate, toll, or charge not specified in such schedules. The rates, tolls, and charges named therein shall be the lawful rates, tolls, and charges until the same are changed as provided in Chapters 1–10 of this title.

8. Petitioners also contend, for the first time in this court, that the Commission erred in failing to provide an informal hearing on their complaint pursuant to 15 DCMR § 103.6 (1991). But § 103.6 is phrased in permissive terms, stating that the Commission "may, from time-to-time" order informal hearings in certain circumstances, not that it must do so.

*the Commission without a formal hearing.* [Emphasis added.]

Section 43–608 thus requires the Commission to hold a "formal hearing" before entering an "order affecting," among other things, "rates" or "schedules." This court has not had occasion to define an "order affecting . . . rates . . . [or] schedules" for purposes of that statute.[9] It is therefore an open question whether an order granting or denying a request for a rate *refund* "affect[s] . . . rates . . . [or] schedules," thereby necessitating a formal hearing pursuant to § 43–608.[10]

We need not determine, however, whether a rate refund proceeding would otherwise require a formal hearing, because

> [e]ven when an agency is required by statute or by the Constitution to provide an oral evidentiary hearing, it need do so only if there exists a dispute concerning a material fact. An oral evidentiary hearing is *never* required if the only disputes involve issues of law or policy.

1 KENNETH C. DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE (3d ed. 1994) (emphasis in original). This "fundamental principle," *id.,* applies to hearings before the Commission. *See Potomac Elec. Power Co. v. Public Serv. Comm'n,* 457 A.2d 776, 789

(D.C.1983) ("A hearing is not necessary where no material facts are in dispute or where the disposition of claims turns not on the determination of facts, but inferences and legal conclusions to be derived from facts already established"); *see also Citizens for Allegan County, Inc. v. Federal Power Comm'n,* 134 U.S.App.D.C. 229, 232, 414 F.2d 1125, 1128 (1969) ("no evidentiary hearing is required where there is no dispute on the facts and the agency proceeding involves only a question of law"). Here, the only issues asserted to be in dispute are (in petitioners' words) "the contradictory and ambiguous tariffs filed by WGL, and the effect, if any, of WGL filings in [the respective proceedings underlying Orders No. 5771 and 5833] (involving Rate Schedule W.)" But there is no dispute, let alone a *material* dispute, about the dates on which WGL filed schedules with the Commission, or about the language contained in any of these schedules. The parties disagree only on the interpretation and effect to be given the schedules filed by WGL setting forth WGL's rates for the Watergate and interruptible customers. As the Commission recognized, these disputes involve issues of law, not fact. A formal hearing was unnecessary to their proper resolution.[11]

---

9. The Commission incorrectly held in Order No. 10457, and the Commission and WGL mistakenly contend in their briefs to this court, that the court addressed this issue in *Washington Gas Light Co. v. Public Serv. Comm'n,* 455 A.2d 384 (D.C.1982), and *Office of People's Counsel v. Public Serv. Comm'n,* 572 A.2d 410 (D.C.1990). *See* Order No. 10457 at 19–20. In *Washington Gas Light Co.,* the court defined a "rate case" for purposes of D.C.Code § 43–612(a)(3), holding that this statutory term means "a proceeding, including a formal hearing, which results in a Commission order fixing any of the rates of a utility." 455 A.2d at 389. In *Office of People's Counsel,* the court stated that the *Washington Gas Light* court had held that a "rate case" for purposes of § 43–612(a)(3) means "a proceeding in which . . . some of the rates of a given utility are set." 572 A.2d at 413.

Section 43–612(a)(3) provides that in (among other types of cases) a "rate case" neither the Commission nor the Office of People's Counsel may individually seek reimbursement of its expenses from the company that is the subject of the proceeding in an amount exceeding 0.25% of the "jurisdictional valuation" of that company. *See* D.C.Code § 43–612(a)(3); 43–612(a)(1). The statute at issue here, § 43–608, deals with the very different subject of the proceedings in which the Commission must provide a formal hearing. Nor does § 43–608 contain the term "rate case." As the Commission itself conceded, §§ 43–608 and 43–612 "ha[ve] nothing to do with" one another. Order No. 10457 at 18 n. 4.

10. This court has held that, under D.C.Code § 1–1509(b) (1991), "an application for a rate *increase* by a public utility requires that a hearing be held before the Commission." *United States v. Public Serv. Comm'n,* 465 A.2d 829, 833 (D.C. 1983) (emphasis added). Petitioners in this case plainly did not apply for a rate increase (or, for that matter, a rate decrease). The instant proceedings addressed only WGL's *past* commodity charges for the Watergate, specifically, the charges assessed from 1976 to 1993. As the Commission stated, "Under no theory presented by either party will a rate be set in this proceeding." Order No. 10457 at 19.

11. Petitioners' remaining contention merits only summary treatment. They argue that the Commission erred in denying their motion for leave to file a reply to WGL's response to petitioners' application for reconsideration of Order No. 10419. As the Commission recognized, its rules

## IV. Conclusion

For the foregoing reasons, Orders No. 10419 and 10457 of the Commission are

*Affirmed.*

and regulations do not provide for the filing of a response to an application for reconsideration. *See* 15 DCMR § 140.1–140.8 (1991). The Commission's refusal to waive, pursuant to 15 DCMR § 146.1, its rules and regulations governing re-

consideration was proper, particularly given its finding after review of the proffered reply that "[the petitioners are] merely attempting to bolster arguments previously stated in [their] Application." Order No. 10457 at 2.