*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 25-AA-0250 & 25-AA-0310

OFFICE OF THE PEOPLE'S COUNSEL OF THE DISTRICT OF COLUMBIA, *et al.*, PETITIONER,

V.

D.C. PUBLIC SERVICE COMMISSION, RESPONDENT,

and

POTOMAC ELECTRIC POWER CO., INTERVENOR.

On Petition for Review of an Order of the
District of Columbia Public Service Commission
(Formal Case No. 1176)

(Argued October 28, 2025                    Decided March 5, 2026)

*Jason T. Gray*, with whom *Sandra Mattavous-Frye*, *Tim B. Hamilton*, *Karen R. Sistrunk*, *Laurence C. Daniels*, and *Ankush Nayar* were on the briefs, for petitioner Office of the People's Counsel of the District of Columbia.

*Jason T. Gray*, with whom *Frann G. Francis* was on the briefs, for petitioner Apartment and Office Building Association of Metropolitan Washington.

*Brian O. Edmonds*, with whom *Jamond D. Perry*, *Naza N. Shelley*, *Stephan Jaksch*, *Shanelle C. Patterson*, *Kenneth R. Stark*, and *Robert A. Weishaar, Jr.* were on the brief, for respondent.

*Dennis P. Jamouneau*, with whom *Anne Bancroft*, *Kimberly A. Curry*, *Taylor W. Beckham*, and *Kunle Adeyemo* were on the brief, for intervenor.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*: The Office of the People's Counsel and the Apartment and Office Building Association, or AOBA, bring this challenge to an order of the Public Service Commission approving Pepco's 2024-2026 electric rate plan. They appeal both the initial order approving a $123.4 million rate increase over two years (No. 22328), and the subsequent order denying their request for reconsideration (No. 22358). Before approving the rate plan in the first instance, the Commission held a "legislative-style hearing" in which the parties were limited to presenting oral arguments and had no opportunity to present witnesses or to cross-examine adversarial witnesses.

The petitioners objected to that limited process before the Commission, and they now renew their challenges on appeal, arguing that the Commission was required to hold an evidentiary, trial-type hearing under the District's Administrative Procedure Act and more specifically the "contested case" requirements codified at D.C. Code § 2-509(b). They also raise several subsidiary claims including, as most relevant here, that the Commission's approval of two aspects of Pepco's rate plan— the Effective Rate Adjustment and the Bill Stabilization Adjustment—was arbitrary and capricious. We agree that this was a contested case which required the Commission to hold a trial-type evidentiary hearing under D.C. Code § 2-509(b),

and that its failure to do so renders its orders unsustainable. We thus vacate the Commission's orders approving Pepco's 2024-2026 rate plan and remand this case for further proceedings.

## I. Facts and Procedural History

This dispute involves a recent change in the Commission's ratemaking practices from the historically approved "annual rate plans" to what is referred to as "multi-year rate plans." This case also appears to be one of the first times the Commission approved any rate plan after holding only a "legislative-style" hearing, instead of the evidentiary hearings it historically held. Multi-year rate plans, as the name suggests, are rate plans the Commission approves for multiple years to come. They raise new questions about how rates should be calculated when the data underlying them, like the number of customers or their expected energy usage, is projected so many years into the future.

Throughout this case the petitioners argued that they were entitled to an evidentiary hearing, where the parties would have the opportunity to present expert witnesses and cross-examine adversarial witnesses, before the Commission could approve any multi-year rate plan. AOBA was especially concerned with the impact of Pepco's plan on the "GT-LV" class of customers, which mostly consists of large commercial buildings like office spaces and apartment complexes. Namely, it

objected to two central features of Pepco's plan: the Effective Rate Adjustment and the Bill Stabilization Adjustment, which are described below.

*Pepco's Plan*

Although the Commission has set rates for decades, this case concerns only the second approval of a multi-year rate plan in the Commission's history. Before turning to the rate plan at issue, we first explain the Commission's transition toward multi-year plans more generally and its approval of Pepco's first multi-year rate plan—the "pilot" program on which the plan at issue here was based.

The Commission began exploring multi-year rate plans in 2017 under D.C. Code § 34-1504(d)(3), which granted it the authority to adopt "alternative forms of regulation" and detailed the requirements for approving them. *Formal Case No. 1139*, Order No. 18846 ¶ 593 (Pub. Serv. Comm'n July 25, 2017). The Commission had previously approved rates based on mostly historical data and up to six months of forecasted data. *Formal Case No. 1156*, Order No. 20273 ¶¶ 82-83 (Pub. Serv. Comm'n Dec. 20, 2019). Multi-year rate plans differ in that they are based on both historical data and up to three years of forecasted data, including capital investments and operations and maintenance costs. *Id.* ¶ 93.

In 2021, the Commission approved a multi-year rate plan for the first time, greenlighting Pepco's proposed 18-month "Modified Enhanced Multiyear Rate Plan Pilot." *Formal Case No. 1156*, Order No. 20755 (Pub. Serv. Comm'n June 8, 2021) (hereinafter "*Order No. 20755*"). In approving the pilot plan, the Commission set a framework for evaluating future multi-year plans to ensure they meet the public interest requirements of D.C. Code § 34-1504(d)(2). The Commission determined that the pilot would "serve as an opportunity to gather valuable lessons learned in assessing future [multi-year rate plan] proposals and to facilitate the development of [alternative forms of regulation]." *Order No. 20755* ¶ 143.

In 2023, Pepco applied for its second multi-year rate plan, the one at issue in this case, requesting a cumulative $190.7 million rate increase for 2024-2026. *Formal Case No. 1176*, Order No. 22328 ¶ 4 (Pub. Serv. Comm'n Nov. 26, 2024). Pepco also filed a "traditional test year" application, as the Commission directed, which proposed rates under the annual plan paradigm based on actual data from January to June 2023 and forecasted data from July to December 2023. *Id*. ¶ 18. The Commission simultaneously evaluated both applications and eventually approved a $123.4 million cumulative rate increase for 2024-2026, which it termed the "Extended Pilot" multi-year rate plan. *Id.* ¶¶ 567-68.

The underlying dispute in this case, as with most ratemaking cases, is how much Pepco should be allowed to charge District consumers. On a basic level, this "revenue requirement" is calculated by multiplying the "ratebase" by the rate of return plus operating expenses. Projected "billing determinants," such as energy sales, number of customers, and billing demand, are essential components of how the ratebase is calculated. And the ratebase is then subject to several backend adjustments.

The petitioners in this case challenge how two of those adjustments are calculated: the Bill Stabilization Adjustment (BSA) and the Effective Rate Adjustment (ERA). The BSA adds a surcharge to future bills when Pepco bills less than expected, and it adds a credit to future bills when Pepco bills more than expected. This insulates Pepco from changes in energy use due to weather, customer response to price increases, or energy-efficiency goals. *Formal Case No. 1053*, Order No. 15556 ¶ 2 (Pub. Serv. Comm'n Sep. 28, 2009). These charges and credits are capped at 10% of Pepco's typical revenue. Amounts above that limit are "deferred" and collected or refunded gradually over future bills, representing the "BSA deferral balance." *Id.* ¶ 32. The ERA adjusts the base distribution rate of a customer's bill to the same level as the typical revenue target authorized under the BSA for each year.

The Commission approved both Pepco's proposed BSA and ERA with some modifications. Although it accepted the BSA mechanism, it penalized Pepco for prior errors in billing determinant forecasts, namely customer counts, that inflated the deferral balances. *Order No. 22328* ¶¶ 504, 508, 510. Pepco submitted that the total deferred BSA balance as of June 2023, which is part of the traditional test year, was $113.7 million, of which 70% was attributable to the GT-LV class. The Commission determined that $15.3 million of the deferral balance was attributable to Pepco's own errors and directed the company to write off the amount rather than charge customers for it. *Id.* ¶¶ 508, 510. It also permitted Pepco to move $39.7 million of the balance from the GT-LV class, which reflected the class's diminished electricity usage during the COVID-19 pandemic, to a new regulatory asset to be amortized over 10 years. *Id.* ¶ 518. It accepted Pepco's proposal to include the remaining balance in the ratebase, allowing the company to earn a return on it. *Id.* ¶ 39-40, 492, 500, 518. The Commission also approved the ERA, stating that the mechanism is necessary for customer classes subject to the BSA "whose class revenue changes as customer counts grow or shrink." *Id.* ¶ 472.

*Procedural History*

In 2023, Pepco applied for the rate increase at issue in this case, and the People's Counsel and AOBA intervened to challenge the proposed rate increase.

The Commission ordered Pepco to file written testimony, exhibits, and lessons learned from the pilot program to supplement its application. *Formal Case No. 1176*, Order No. 21886 ¶ 1 (Pub. Serv. Comm'n July 28, 2023). After filing their own written testimony and exhibits, the People's Counsel, AOBA, and others sought summary disposition. The Commission denied these motions and instead scheduled a legislative-style hearing on the matter. *Formal Case No. 1176*, Order No. 22013 ¶¶ 28-30 (Pub. Serv. Comm'n June 28, 2024). It directed the parties to file pre- and post-hearing briefs, written testimony, and exhibits in support of their positions. *Id.* ¶ 38.

The Commission began using legislative-style hearings in lieu of evidentiary hearings in some ratemaking cases in 2023. *Formal Case 1169*, Order No. 21582 (Pub. Serv. Comm'n Mar. 14, 2023). Although the Commission does not have any internal rules or procedures governing these hearings, it has crafted guidance on when legislative-style hearings are appropriate in a series of orders. It has ordered that evidentiary hearings are not necessary "where no material facts are in dispute or where the disposition of claims turn not on the determination of facts but on inferences and legal conclusions." *Id.* ¶ 9. As the Commission puts it, in such cases there is "little need" for each party to cross-examine witnesses, and it can "decide, based on the written testimony, which opinion to credit." *Id.*

During the legislative-style hearing and in their pre- and post-hearing briefs, the petitioners maintained that an evidentiary hearing was required to resolve several disputes over material issues of fact. The People's Counsel argued that the projected energy use per customer was inaccurate and that a prudency review of Pepco's 2023 investments was necessary. AOBA argued that the amount of BSA revenue deferrals for the GT-LV class was "overstated" and based on a "flawed methodology" which relied on underestimates for the GT-LV customers in the pilot plan, thereby inflating the expected revenue per customer. It also argued that the ERA should be eliminated and that it increased the GT-LV rate class revenue requirements over 30% *before* the proposed revenue increase was added to the existing revenue requirement.

The Commission declined to hold an evidentiary hearing, instead proceeding on the written testimony, exhibits, and responses to data requests in the evidentiary record in issuing its November 2024 order approving a modified version of Pepco's multi-year rate plan for 2024-2026. *Order No. 22328* ¶¶ 26, 92. The order stated that AOBA's argument that the ERA added unjustified revenues to the GT-LV class was not "valid," while also noting that the magnitude of the ERA for the GT-LV "is concerning." *Id.* ¶ 473. It also approved Pepco's BSA mechanism, with some adjustments, as explained above. Commissioner Richard Beverly dissented from the order, calling the "process in this case" a "regulatory trainwreck that unreasonably

promotes Pepco's interest at the expense of ratepayers." He did not argue that a full-blown evidentiary hearing was required, but he instead posited that as a matter of "pure policy" Pepco's plan should be rejected as "premature." *Id.* ¶¶ 1-2 (Beverly, Comm'r, dissenting).

The People's Counsel and AOBA filed applications for reconsideration, again arguing that forgoing an evidentiary hearing violated their due process rights and D.C. Code § 2-509(b)'s procedural requirements for contested cases because there were several issues of material fact in dispute. AOBA argued that Pepco's computed revenue deferrals for the GT-LV rate class did not reflect "cost-based ratemaking" because they were based on "substantially erroneous numbers of the GT-LV customers in its design of rates." It calculated the actual total BSA under recoveries for the 23-month period between January 2023 and November 2024 as $8,769,909, while Pepco's monthly BSA filings over that period claim $57,833,313 in under-recoveries—a $49 million discrepancy. It also renewed its arguments that the ERA improperly added revenues to the base rate requirement for the GT-LV class.

The Commission denied the applications for reconsideration, stating that it was not required to hold an evidentiary hearing under D.C. Code § 2-509(b) because there were no material facts in dispute. *Formal Case No. 1176*, Order No. 22358 ¶¶ 28-35 (Pub. Serv. Comm'n Jan. 28, 2025). The Commission briefly explained

that AOBA's arguments regarding the ERA and BSA did not raise any genuinely disputed issue of fact that would require an evidentiary hearing. *Id.* ¶¶ 98-99. It also reiterated its finding that complaints about the ERA were "not valid," without further explanation. *Id.* ¶ 99.

Commissioner Beverly again dissented, arguing that there were two specific problems with the order denying reconsideration: (1) it did not address the fact that investments made in the multi-year rate plan pilot were not properly reviewed for prudency and (2) it did not explain its approval of the ERA and the BSA deferral balance. Specifically, Commissioner Beverly highlighted the $49 million discrepancy between how AOBA and Pepco calculate the BSA deferral balance and stated that it is not clear to him from either order "how the majority arrived at adopting Pepco's calculations over AOBA's." He also argued that the Commission did not explain why it disagreed with AOBA's claim that the ERA added unjustified revenues to the GT-LV class. *Order No. 22358* ¶¶ 5-6 (Beverly, Comm'r, dissenting).

The People's Counsel and AOBA now petition this court for review, challenging the Commission's approval of the multi-year rate plan for 2024-2026 and its denial of reconsideration.

## II. Standard of Review

This court's review of Commission decisions is "limited to questions of law," and findings of fact "shall be conclusive" so long as they have substantial support in the record and are not "unreasonable, arbitrary, or capricious." D.C. Code § 34-606; *Off. of People's Couns. v. Pub. Serv. Comm'n of D.C.*, 797 A.2d 719, 725 (D.C. 2002). The Commission's policy choices are "beyond both the jurisdiction and the competence of a reviewing court" provided it "explains the basis" for those choices. *Id.* at 727. Substantial evidence sufficient to support agency findings requires "more than a mere scintilla and such that reasonable minds might accept it as adequate to support a conclusion." *Id.* at 725-26. Petitioners bear the burden to prove that a Commission order is "unreasonable, arbitrary, or capricious" by "demonstrating 'clearly and convincingly a fatal flaw in the action taken.'" *Wash. Gas Light Co. v. D.C. Pub. Serv. Comm'n*, 856 A.2d 1098, 1104 (D.C. 2004) (quoting *Bell Atl.-Washington, D.C., Inc. v. Pub. Serv. Comm'n of D.C.*, 655 A.2d 1231, 1233 (D.C. 1995)). The Commission likewise must "explain its actions fully and clearly" to enable meaningful judicial review. *Off. of People's Couns. v. Pub. Serv. Comm'n of D.C.*, 799 A.2d 376, 379 (D.C. 2002).

### III. Analysis

The petitioners argue that (1) the Commission's decision not to hold an evidentiary hearing violated D.C. Code § 2-509(b) and their constitutional due process rights;[1] (2) the Commission's decision to forgo an evidentiary, trial-type hearing was not adequately explained; (3) the Commission failed to explain why the ERA and BSA were approved, despite the vast discrepancies in how the parties' experts calculated the deferral balances, rendering its approval of them arbitrary and capricious; (4) the Commission's decision to approve Pepco's multi-year rate plan without following the framework contemplated by the pilot program for reviewing future plans was arbitrary and capricious; and (5) the Commission's decision to rule on the merits in the same order that first identified what materials were in the evidentiary record deprived the petitioners of the necessary procedures for contesting the evidentiary record.  Because we conclude that this was a contested

---

[1] The Commission argues that the petitioners "either abandon or fail to substantiate their" constitutional due process claims, given their paltry briefing on that constitutional question.  Even if the Commission were right about that, any forfeiture of the constitutional argument is irrelevant to our analysis below, where we address only petitioners' statutory argument that they were deprived of an evidentiary hearing they were entitled to under D.C. Code § 2-509(b), and the Commission does not contend petitioners failed to adequately develop that argument.  Because we agree with petitioners on the merits of that statutory argument, we have no occasion to address whether their constitutional due process rights were violated or whether they adequately briefed that claim.

case and that the decision not to hold an evidentiary hearing violated D.C. Code § 2-509(b),[2] we do not address the remaining arguments. For the sake of judicial and administrative efficiency, however, we note that the Commission's failure to explain why it approved the BSA and ERA despite the vast discrepancies in the record about their proper calculations would seem to provide an independent ground to vacate and remand the case.

*A. The Commission was required to hold an evidentiary hearing because there were multiple material factual disputes.*

The Commission is required to hold a "formal hearing" in every case where a party reasonably complains that a public utility's rates are unjust. D.C. Code § 34-908. Under the D.C. Administrative Procedure Act, in "contested cases," "[a]ny oral and any documentary evidence may be received" and "[e]very party shall have the right to present in person or by counsel his case or defense by oral and documentary evidence, to submit rebuttal evidence, and to conduct such cross-

---

[2] At oral argument the Commission suggested that we do not have jurisdiction because this is not a contested case under the D.C. Administrative Procedure Act. We disagree. We further note that even if this were not a contested case, we have express statutory authority to review the Commission's ratemaking decisions under D.C. Code § 11-722(2), regardless. *See Commc'n Workers of Am., Loc. 2336 v. D.C. Taxicab Comm'n*, 542 A.2d 1221, 1224 n.8 (D.C. 1988).

examination as may be required for a full and true disclosure of the facts." D.C. Code § 2-509(b).

Although the Commission must hold a hearing in every contested case, our decision in *Watergate* clarified that a trial-type evidentiary hearing is needed only "if there exists a dispute concerning a material fact." *Watergate East, Inc. v. Pub. Serv. Comm'n*, 662 A.2d 881, 890 (D.C. 1995) (citation omitted); *see also Apartment & Off. Bldg. Ass'n of Metro. Wash. v. Pub. Serv. Comm'n*, 203 A.3d 772, 782-83 (D.C. 2019). A fact is not material "simply because it was raised at a hearing and evidence was offered on the point." *Daro Realty, Inc. v. D.C. Zoning Comm'n*, 581 A.2d 295, 303 (D.C. 1990). Rather, the issue must be necessary to the agency's decision-making process. *Id.*

To illustrate when the Commission might properly bypass an evidentiary hearing, consider *Watergate*, 662 A.2d 881. In that case, the Commission granted Washington Gas Light Company (WGL) a rate increase for certain water and gas customers, after which WGL filed a tariff amendment. The parties disputed whether that tariff amendment replaced the old rate schedule applicable to the Watergate complex, and the Commission ruled that it did. *Id.* at 886-87. We will not get too bogged down in the complicated facts of that challenge, because it suffices to say that *Watergate* cogently explained why "the Commission's determination" under

review was "not in essence a factual finding, but rather a conclusion about the legal effect of WGL's [tariff amendment] filings," *id.* at 886, which is precisely the type of legal dispute that does not require a full-blown evidentiary hearing: The parties "disagree[d] only on the interpretation and effect to be given" to a previously approved rate schedule, which purely involves "issues of law, not fact." *Id*. at 890.

The Commission misread *Watergate* as permitting it to bypass a trial-type evidentiary hearing even though the parties in this case were at clear loggerheads over hotly disputed factual questions that required elucidation from competing experts. In defense of its approach, the Commission opined that it could determine which of the expert witness's opinions "to credit based on written testimony and exhibits."

That is quite mistaken. "Cross-examination 'is the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Gaines v. United States*, 994 A.2d 391, 399 (D.C. 2010) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). That is especially true with expert witnesses, where the factfinder will often lack the experience to independently scrutinize competing expert testimony, so observing how the competing experts hold up under scrutiny, and how they explain the discrepancies between their own and a competing expert's testimony, is absolutely vital. "Use of the adversary process should allow the

opposing attorneys to explore an expert's reasoning more selectively and, hence, more efficiently, while reducing the opportunities for deceptive manipulation of the testimony." *Clifford v. United States*, 532 A.2d 628, 633 (D.C. 1987) (citing 3 Weinstein's Evidence ¶ 705[01], at 705-06 (1985); 2 Wigmore, Evidence § 686, at 813 (3d ed. 1940); and McCormick on Evidence § 16).

We further observe that, contrary to the Commission's understanding, evidentiary hearings are the rule, not the exception. That is because most ratemaking cases, like this one, will present both issues of policy and fact. The disputes in this case were based not only on policy differences or the "legal effect" of a Commission decision, but also on questions of fact, like the accuracy of Pepco's BSA deferral balance and ratebase level calculations. The parties were entitled to cross-examine expert witnesses on the values they used, and how those values were calculated, in order to test the veracity of those decisions and calculations. *See Motorola Inc. v. Murray*, 147 A.3d 751, 754 (D.C. 2016) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

We briefly expand on two examples of material factual disputes in this case: (1) the accuracy of projected customer counts for the GT-LV class, and thus the amount of BSA deferral balance and (2) the accuracy of the projected energy use per customer, which impacts the level of ratebase.

### 1. Projected GT-LV customer counts and BSA deferral balance

There is a genuine and significant factual dispute among the parties over the amount of BSA deferral balance based on a dispute over the accuracy of Pepco's projected customer counts for the GT-LV class. Pepco, through its witness, Robert T. Leming, proposed a $113,781,401 ratebase adjustment reflecting the BSA deferred revenue balance as of June 30, 2023, of which over 70% was attributed to the GT-LV class. AOBA witness Bruce R. Oliver argued that the magnitude of under-recovery was "primarily driven by significant differences between the Company's actual numbers of Rate Schedule GT-LV customers and the numbers of Rate Schedule GT-LV customers that were assumed in the design of Pepco's rates for that class." According to Oliver, these distorted customer counts created "non-cost-based increases" in Pepco's allowed BSA recovery. AOBA argued that these unrepresented customer counts led to a large discrepancy in how AOBA and Pepco calculated the total deferral balances for the GT-LV class for the period from January 2023 to November 2024. AOBA calculated the total deferral balances to be $8,769,909, while Pepco's monthly BSA filings over that period totaled $57,833,313.

The amount of BSA under-recovery, and whether it is based on inaccurate customer counts, are quintessential issues of fact that the experts disputed. The

amount of BSA under-recovery was material to the Commission's decision-making process because it impacts the rate that Pepco is permitted to charge its customers. Had the parties had the opportunity to cross-examine these witnesses, they could have tested the veracity of the different methods used for calculating the total BSA under-recovery balance.

## 2. Projected energy use per customer

Similarly, the accuracy of the projected energy use per customer, which impacts the total revenue deficiency, is an issue of material factual dispute. In her written direct testimony, Pepco witness Ekaterina Efimova explained how Pepco forecasted billing determinants based on historical data. The People's Counsel argued that those projections were inaccurate and presented its own expert witness, Michael P. Gorman, to explain why. Gorman testified that Pepco's method for forecasting monthly average energy use per customer underestimated revenues and overstated Pepco's claimed revenue deficiency. Gorman disagreed with Efimova over what factors needed to be considered when calculating projected energy use per customer, such as energy efficiency and conversion to electrification. He argued that Efimova's methodology resulted in understated sales, inflating revenue requirements and thus customer bills. In Efimova's rebuttal testimony, she disagreed with Gorman that the forecast was imbalanced and defended omitting

factors like electrification from the calculation. The Commission ultimately accepted Pepco's forecasts and responded to this disagreement by stating that the accuracy of Pepco's customer, energy, and demand forecast would be examined as part of its forthcoming management audit. *Order No. 22328* ¶ 320.

If you find that difficult to decipher, join the club! What is clear and easy to understand, however, is that Efimova and Gorman had fundamental factual disagreements about how to accurately project energy use per customer. An evidentiary hearing was required to resolve those disputes. Efimova's calculation of the projected energy use, including what factors were to be included, was an issue of dispute that should have been tested through cross-examination to see if it could withstand scrutiny. Similarly, through cross-examination Pepco would have had the opportunity to pick apart Gorman's calculations and cast doubt on the factors he thought were essential to accurately projecting energy use. This was material to the Commission's decision-making process because it impacted the level of ratebase, and thus Pepco's revenue requirement.

While we appreciate that, as the Commission argues, evidentiary hearings might not always be productive, that does not negate the clear mandate of § 2-509 and *Watergate*. Conflicts in expert testimony, including about values like customer counts and projected energy use per customer and how they are calculated, are

material disputes for which evidentiary hearings are required in contested cases like this one.

*B. The Commission failed to explain its ERA and BSA deferral balance decisions.*

Although the foregoing analysis is enough for us to vacate the challenged orders and remand for the Commission to hold a trial-type evidentiary hearing, we note briefly an independent basis on which we would vacate and remand in any event: the Commission's failure to explain its approval of the ERA and why it credited Pepco's calculations of the BSA deferral balances over AOBA's.

When an agency fails to explain its decision "fully and clearly," we cannot conduct a meaningful judicial review of that decision and the case must be remanded. *Off. of People's Couns.*, 797 A.2d at 726. Although we "accord great respect to the Commission in a complex, esoteric area such as ratemaking," *id.*, there is also "a substantial risk that agency action will be too conclus[ory]" and without further explanation a court "could simply be fooled into accepting arbitrary agency action." *Wash. Pub. Int. Org. v. Pub. Serv. Comm'n*, 393 A.2d 71, 78 (D.C. 1978).

Here, the Commission's determinations regarding the ERA and BSA deferral balances were conclusory and unsubstantiated, rendering judicial review of those decisions impracticable. First, even though AOBA raised in its post-hearing brief

that its calculations of the BSA deferral balances differed from Pepco's by around $49 million, the Commission never explained why it credited Pepco's calculation over AOBA's. Second, the Commission did not explain why it rejected AOBA's contention that the ERA added revenue requirements to the GT-LV class. Instead, it repeated in both the initial order and the order denying reconsideration that the claim was not "valid." We have no idea what reasoning underpinned those bare declarations, so we would independently vacate and remand for further explication even had the Commission held the required evidentiary hearing in this case.

## IV. Conclusion

For those reasons, we vacate Order Nos. 22328 & 22358 and remand with instructions for the Public Service Commission to hold an evidentiary hearing.

*So ordered.*